WILLIAM A. GILDEA *vs.* LEONARD H. ELLERSHAW & others.[1]

Plymouth. October 5, 1972.— July 9, 1973.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & KAPLAN, JJ.

*Public Officer. Actionable Tort. Municipal Corporations,* Officers and agents. *Jurisdiction,* Removal from office.

Review of authorities pertaining to the immunity of public officials from personal liability in tort for official acts. [805–820]

A public official other than a judicial officer, acting in good faith and without malice or corruption, is not liable to a private party for negligence or other error in making a decision within the scope of his authority. [820–823]

That the removal from office of a city manager by city councillors was invalid for failure to comply with G. L. c. 43, § 89, did not deprive the councillors of their immunity from personal liability for their official act of attempting to remove him. [823–825]

---

[1] The writ originally named as defendants the city of Brockton and the seven persons who were the members of its city council on April 16, 1961. The only defendants who are parties to the present bill of exceptions are those named and described in count 13 as "Leonard H. Ellershaw, Hipolit Moncevicz, Edmund R. Leonard, F. Milton McGrath, and George F. Rodenbush, [who] were in the year 1961 five (5) of the seven (7) members of the . . . City Council."

TORT. Writ in the Superior Court dated March 24, 1963.

The action was tried before *Taveira*, J.

*P. J. Piscitelli (John P. Connor, Jr.,* with him) for the defendants.

*Robert G. Clark, III,* for the plaintiff.


QUIRICO, J. This is an action of tort in which the plaintiff, the former city manager of the city of Brockton, seeks to recover damages from five former members of the Brockton city council (defendants) for their alleged wrongful and unlawful action in attempting to remove him from his office as city manager. The case was tried to a jury who returned a verdict for the plaintiff on count 13 and it is now before us on the defendants' bill of exceptions limited to this count of the plaintiff's declaration.[2]

Count 13 alleges in substance that in April, 1961, when the plaintiff was the city manager of the city of Brockton, the five defendants who were five of the seven members of the city council wrongfully and unlawfully purported to remove him from his office, and in so doing they failed and refused to furnish him with specific reasons for his removal and to afford him a reasonable opportunity to prepare and present his defence as required by G. L. c. 43, as amended. It further alleges that as a result of the defendants' wrongful and unlawful conduct his reputation, credit and standing in the community were damaged, he was deprived of the salary of his office, was put to expense to litigate the matter, was caused to suffer injury to his feelings and great anguish of mind, and it

---

[2] The remaining counts of the fourteen count amended declaration were disposed of as follows. By counts 1, 2 and 12 the plaintiff sought recovery from the city for the salary due him from April 20, 1961, when he was suspended, to the end of that year when the position of city manager was abolished by a change in the city's charter. The jury returned a verdict for the plaintiff on those counts and the city paid him the total amount due thereon. Counts 3 through 11 alleging conspiracies by the remaining five defendants were waived in open court before trial. The trial judge ordered verdicts for the seven councillors who were also defendants in count 12, and for the five present defendants under count 14.

was impossible for him to secure employment as a city manager or in a position of comparable status elsewhere. The declaration makes no allegation that the defendants acted in bad faith or with malice in their efforts to remove him.

A brief statement of the factual background from which this litigation arose will be helpful. On January 6, 1958, the city of Brockton installed its first city government under a Plan D form of city charter as described in G. L. c. 43, §§ 79 through 92A, as appearing in St. 1948, c. 459, § 8. The charter provided for a mayor, a city council of seven persons and a city manager. On the same date the city council appointed the plaintiff the city manager to "hold office during the pleasure of the city council" as provided in § 89. At the municipal election in November, 1959, the voters of Brockton voted to adopt a Plan B form of charter as described in G. L. c. 43, §§ 56 through 63, to supersede the Plan D form of charter on January 1, 1962.[3]

At a meeting of the city council held on April 7, 1961, the five defendants filed a proposed order, signed by all of them, that the plaintiff "be removed from office for cause, in accordance with . . . [G. L. c. 43, § 89]; the final vote on his removal . . . not to be taken until after, upon his request, he be given a written statement of the reasons alleged for his removal, and the right to be heard publicly thereon at a meeting of the City Council" and that pending such proceedings he be suspended from office. The order was adopted at a meeting of the council held on April 10, 1961, the five defendants voting for adoption and the other two councillors voting against adoption. At the same meeting the plaintiff filed (a) a written demand for a public hearing on the order of removal, (b) a written demand that he be given a state-

[3] Although G. L. c. 43, § 13, provides that "[s]hould any plan provided for in this chapter be adopted, it shall continue in force for at least four years from the beginning of the terms of office of the officials elected thereunder," the Brockton vote to change to Plan B less than two years after Plan D took effect was specially authorized by St. 1959, c. 225.

ment, in writing, of the reasons alleged for his removal, for cause, and for his suspension, and (c) a reservation of his right to challenge his proposed removal by reason of a number of alleged irregularities in the removal proceedings.

On or about April 11, 1961, the defendants caused to be delivered to the city clerk of Brockton a written statement addressed to the plaintiff and reading in part as follows: "[W]e submit the following reasons for your removal as city manager of the city of Brockton:—1. We no longer have any confidence in your ability to properly administer the affairs of the city of Brockton. 2. We feel that it is in the best interests of the city of Brockton to terminate your services as city manager. You are hereby notified that . . . you will have the right to be publicly heard thereon at a meeting of the city council, to be held on Monday next, April 17, 1961, at eight P.M., in the City Council Chamber." The city clerk caused a copy of this document to be delivered to the plaintiff's residence. This document was drafted at a conference of four of the defendants and signed by all five defendants before it was filed with the city clerk. It was never read or adopted at any meeting of the city council as "a written statement of the reasons alleged for . . . removal" of the plaintiff from office. G. L. c. 43, § 89.

At a meeting held on April 17, 1961, the city council held a public hearing on the proposal to remove the plaintiff from the office of city manager. The plaintiff and his then attorney spoke at some length in the plaintiff's behalf, and other persons were given an opportunity to be heard. After the public hearing was closed the defendants presented a proposed order, previously signed by all of them, to the effect that "the services of William A. Gildea are terminated, and that this vote be a final vote on the subject of the removal of said William A. Gildea as City Manager." The vote on the order was deferred to the council meeting of April 20, 1961, at which meeting it was adopted with the five defendants voting for adoption and the other two councillors voting against

adoption.   At a meeting held on April 22, 1961, the city
council appointed the city clerk as the acting city man-
ager, and he continued to serve in that capacity for most
or all of the balance of that year.

In July, 1961, the plaintiff entered a petition for a writ
of mandamus and a petition for certiorari in the Supe-
rior Court against the present defendants and others con-
testing the validity of his removal.   The petitions were
heard before a judge (first judge) other than the one who
presided over the present case.   On November 1, 1961,
he found and ruled that the statement of reasons for re-
moval signed by the five defendants and served on the
plaintiff on or about April 12, 1961, did not satisfy the
requirements of G. L. c. 43, § 89,[4] for the primary reason
that it was never "adopted by the members of the city
council at any meeting thereof, special or regular."   On
November 14, 1961, he ordered that both petitions be
dismissed "as matter of discretion, and not of law, . . .
without prejudice to the bringing of other proceedings
for claim for compensation."[5]   The record indicates no
claim of exceptions to or appeal from the rulings or
orders disposing of those petitions.   The present action
was started by a writ dated March 24, 1963.

Although the defendants' bill of exceptions purports
to present thirty-two separate exceptions before this
court for consideration and decision, we consider first the
principal issue around which many of the exceptions re-
volve.   That issue is (a) whether the plaintiff is en-
titled to recover on the basis of alleging and proving

---

[4] Section 89 provides in pertinent part that "[t]he city manager may
be removed for cause by the city council . . . but he shall, prior to
his removal, upon his request, be given a written statement of the
reasons alleged for his removal."

[5] In dismissing the petitions as matter of discretion the judge said
he was influenced by (a) the fact that the interim acting city manager
had acted on a large number of muncipal matters of importance since
his appointment on April 22, 1961, many of them before the plain-
tiff's entry of his petitions for mandamus and certiorari in July, 1961,
(b) the fact that if reinstated the plaintiff could serve as city man-
ager for only seven weeks because a new charter would take effect
on January 1, 1962, and (c) the motives of the plaintiff in seeking
to be reinstated in the office of city manager.

merely that the defendants attempted to remove him as city manager and in doing so they failed to comply with the requirements of G. L. c. 43, § 89, with the result that the judge who heard the mandamus proceedings held that the defendants' vote purporting to remove the plaintiff "is of no force or effect in removing him from that office," or (b) whether the plaintiff must allege and prove, in addition thereto, that the defendants acted in bad faith or with malice in attempting to remove him from office. The plaintiff did not allege or prove, and he contends that he is not required to allege or prove, bad faith or malice on the part of the defendants in order to recover. The defendants contend that the plaintiff is required to do so and that having failed to do so he is not entitled to recover.

The plaintiff neither alleged nor offered any evidence that the defendants acted in bad faith or with malice. Whenever, during the trial, the defendants offered evidence tending to bear upon or prove that they had acted in good faith and without malice, the plaintiff objected thereto and the evidence was excluded. The defendants filed motions for directed verdicts in their favor at the close of all the evidence which squarely raised the issue of the sufficiency of the plaintiff's allegations and proof. They again raised this question by their exceptions to the trial judge's refusal to give requested instructions to the jury and by exceptions to instructions actually given to the jury.

We hold that the plaintiff's allegations and proof were insufficient to entitle him to recover, and that the denial of the defendants' motions for directed verdicts was error.

It is quite obvious that in the matter of the principal issue which we are now discussing the plaintiff relies almost entirely on our decision in *Stiles* v. *Municipal Council of Lowell*, 233 Mass. 174. In that case the plaintiff held a civil service position as city treasurer and collector of taxes. The city council had authority to remove him for cause under statutes relating to the civil service.

Three of the five city councillors purported to suspend
and remove him but they failed to comply with a statu-
tory requirement that they give him notice of the pro-
posed action and a statement of reasons for removal.
When the matter first came before this court in *Stiles*
v. *Municipal Council of Lowell*, 229 Mass. 208, 210, we
held the removal was a nullity. When a second proceed-
ing between the same parties came to us in *Stiles* v. *Mu-
nicipal Council of Lowell*, 233 Mass. 174 (the *Stiles* case),
we held that the three councillors were liable in dam-
ages, including counsel fees incurred by the plaintiff,
for their interference with the rights of the plaintiff "in
ways not authorized by law" and that "[t]he cloak of
office is no protection to them even when acting in good
faith."

It was not until October 27, 1967, that counsel for the
plaintiff first moved to add to his declaration the original
version of the present count 13,[6] while simultaneously
waiving counts 3 through 11. He informed the judge at
that time that he had examined the original declaration
and record on appeal in the *Stiles* case and that he was
following the pleadings and pattern in that case in
amending his declaration and waiving counts thereof.

It is equally obvious that the judge too relied on our
decision in the *Stiles* case in his rulings on the admissi-
bility of evidence and in his instructions to the jury.
He excluded all evidence tending to prove that the de-
fendants acted in good faith and without malice. He in-
structed the jury "that good faith is not a defense and
that malice need not be proven, . . . [and that] malice,
good faith or lack of good faith is of no consideration."
The judge instructed the jury at greater length on this
subject by either quoting directly or paraphrasing much

[6] The motion to add count 13 was filed on October 27, 1967, and
it was heard and allowed on November 15, 1967. Trial started on
November 20, 1967. On November 30, 1967, the day the case was
submitted to the jury for decision, count 13 was amended to its pres-
ent form by eliminating prior allegations concerning the mandamus
and certiorari proceedings brought by the plaintiff.

Gildea *v.* Ellershaw.

of the pertinent language from that decision which appears in the margin.[7]

Our decision in the *Stiles* case has been cited most frequently by this court in connection with its language concerning (a) the nature of the power and function of re-

---

[7] In the *Stiles* case, *supra*, we said, at 181–183: "The defendants, in passing upon the question of the removal of a city officer under civil service rules, were executive or administrative officers. If they had followed the requirements of the civil service laws in making the removal, they then would have been performing functions to some extent judicial. The power to remove an officer in the public service is in its nature executive, when considered by itself alone. . . . When, as essential prerequisites to the exercise of that power, there must be a formulation of specific charges as grounds for removal, notice of those charges to the person to be removed, opportunity to him for a hearing, followed by a hearing and decision, then the hearing and decision partake also of the 'nature of a judicial investigation.' . . . Speaking with accuracy, the removal by a municipal council under these circumstances is still an executive or administrative act which must be performed in this particular in a judicial manner. . . .

"Treating the liability of the defendants in its executive or administrative aspect, they are bound to act in accordance with the law. They acquire no authority in the premises except such as the law confers. The plaintiff had an interest in remaining in office, of which he could not be deprived except in accordance with law. Continuance in office was valuable to him both as a means of support and as matter of reputation. . . . Personal liability attaches to executive or administrative officers who interfere with rights of individuals in ways not authorized by law. The cloak of office is no protection to them even when acting in good faith . . .

"If the defendants' position is approached from the viewpoint of exercising the judicial faculty, the same result follows. 'All inferior tribunals and magistrates . . . if they act without any jurisdiction over the subject matter; or if . . . they are guilty of an excess of jurisdiction . . . are liable in damages to the party injured by such unauthorized acts.' . . . Although there are contrary decisions on this point, to the effect that good faith may be a defence or that there is liability only if there is malice, the weight of authority is in favor of the absolute liability established so firmly in our jurisprudence by the decisions already cited as not to be open further to discussion. . . .

"It is plain that the defendants never acquired a jurisdiction to exercise their *quasi* judicial functions respecting the removal from office of the plantiff, because they never notified him and never gave him a copy of the charges against him and he did not voluntarily submit himself to their action, but has resisted and asserted the invalidity of their procedure at every point. The full performance of all conditions established by the statute are essential prerequisites to the jurisdiction of the municipal council over the subject matter of the removal of an officer. . . .

"The municipal council was clothed with the power of removal of city officers so long as there was conformity to the requirements of the law. When the members ceased to comply with the law they were acting outside their official capacity and were subjected to responsibility as individuals."

moval of public officers or employees, (b) the effect of the failure to comply with prescribed procedures for removal on the validity of a purported removal, and (c) the recovery of legal fees which the person illegally removed was caused to incur or expend to contest his removal,[8] but it has been cited and applied in support of recovery of damages in tort against an official for error committed in his official capacity. In *Ashton* v. *Wolstenholme*, 243 Mass. 193, a civil service employee who had been unlawfully demoted by a former city engineer requested the successor engineer to restore him to his proper grade and the latter failed to do so. In upholding a finding for the plaintiff, we said, at pp. 195–196, citing the *Stiles* case: "If the plaintiff was lowered in rank except as authorized by the statute . . . the officer guilty of the wrong would be liable in damages. . . . And if the defendant continued for eight months, without lawful excuse, to refuse to restore the plaintiff to the grade assigned him, he would be liable for the wrong done the plaintiff. . . . There was no error in refusing the request bearing on the defendant's good faith in failing to restore the plaintiff to the grade assigned him by the civil service commission. The defendant's good faith constituted no defence for the wrong done."

In *Forbes* v. *Kane*, 316 Mass. 207, we upheld a finding for the plaintiff inspector of wires and gas in an action of tort alleging that the defendant mayor unlawfully attempted to remove him from office and otherwise interfered with the plaintiff's performance of his duties as such inspector. Although we cited our decision in the *Stiles* case in the *Forbes* opinion, the two cases are readily distinguishable. In the *Stiles* case the councillors had jurisdiction to remove the civil service employee provided they followed the prescribed procedures. In the

---

[8] As to recovery for legal fees, the *Stiles* case has been expressly overruled by *Chartrand* v. *Riley*, 354 Mass. 242, 245, as acknowledged in *Wachusett Regional Sch. Dist. Comm.* v. *Erickson*, 354 Mass. 768. This partial overruling applied equally to the same point in *Ashton* v. *Wolstenholme*, 243 Mass. 193.

*Forbes* case it appeared (at p. 215) that the mayor "was not the proper officer to conduct the hearing on the removal of the plaintiff."

It is somewhat difficult to determine the exact basis on which the court imposed liability in tort on the defendant city councillors in the *Stiles* case. The opinion includes a discussion of the question whether the removal of a municipal officer is an executive, administrative or judicial function and it concludes that it may have some of the aspects of all three functions. It says, at p. 181, that if the city councillors "had followed the requirements of the civil service laws in making the removal, they then would have been performing functions to some extent judicial," but that "[t]he power to remove an officer in the public service is in its nature executive, when considered by itself alone." It then says, at p. 182, that even if the defendants' acts were "approached from the viewpoint of exercising the judicial faculty," they would be liable in damages to a party injured if they acted "without any jurisdiction over the subject matter." It concluded, at p. 183, that "[i]t is plain that the defendants never acquired a jurisdiction to exercise their *quasi* judicial functions respecting the removal from office of the plaintiff, because they never notified him and never gave him a copy of the charges against him."

The decision in the *Stiles* case seems to rest on the ground that to the extent that the city councillors' attempt to remove the plaintiff from office "is considered as executive or administrative," personal liability attaches to them for "personal misfeasance in performance of public duty." It related their liability to that of field drivers authorized to take stray animals but who mistakenly take animals not covered by the statute (*Coffin* v. *Field*, 7 Cush. 355), to that of health officers authorized to kill certain diseased horses but who in good faith but mistakenly kill a horse later determined not to have been diseased (*Miller* v. *Horton*, 152 Mass. 540, decided by a bare majority of the court), to that of "election officers for a well intentioned mistake of judgment in

refusing registration and in denying the right to vote to one duly qualified" (*Blanchard* v. *Stearns*, 5 Met. 298, 300; *Kinneen* v. *Wells*, 144 Mass. 497, 504)), and in general to the liability of "municipal officers for acts of personal misfeasance in performance of public duty, *Moynihan* v. *Todd*, 188 Mass. 301."

In view of the extent to which the *Stiles* case rested on the authority of *Miller* v. *Horton*, 152 Mass. 540, and similar cases, its value as a precedent has been greatly undermined by recent criticism of the *Miller* decision by this court and by legal scholars. In *DiMaggio* v. *Mystic Bldg. Wrecking Co. Inc.* 340 Mass. 686, we discussed the *Miller* decision and then said, at p. 691, "We thus need not consider whether *Miller* v. *Horton* will now be followed on its precise facts. Certainly, in recent cases, it has not been considered on the issue of its basic holding." In a footnote to the *DiMaggio* decision we referred to texts and other legal articles discussing the *Miller* decision.[9]

A literal reading and strict application of the language in the *Stiles* case would expose every public officer to personal liability in tort for damages to any person adversely affected by a decision of the public officer which is in an area or on a subject within his jurisdiction or competence to decide but which is invalid because of the failure, innocent or otherwise, of the officer to comply with some condition or procedure essential to the

---

[9] That footnote appears in 340 Mass. 686, 690, and is as follows: "Authorities discussing *Miller* v. *Horton* and similar decisions are collected in Harper and James, Torts, §§ 29.8–29.10; Davis, Administrative Law (1958 ed.) §§ 25.13, 26.05 (severely critical of the decision); Parker, Administrative Law, 27, 34, 132, 203; Jennings, Tort Liability of Administrative Officers, 21 Minn. L. Rev. 263, 282, 291; Gray, Private Wrongs of Public Servants, 47 Calif. L. Rev. 303, 325; Brown, Use of Extraordinary Legal and Equitable Remedies, 22 B. U. L. Rev. 55, 90–91; Lewis, Finality of Findings of Fact in Regulation of Public Health and Professions in Massachusetts, 21 B. U. L. Rev. 696. See also Prosser, Torts (2d ed.) § 25, § 109, at pp. 782–784; Parker, Execution of Administrative Acts, 24 Chi. L. Rev. 292, 301. Cf. Jaffe, Judicial Review: Constitutional and Jurisdictional Fact, 70 Harv. L. Rev. 953, 967."

validity of the decision.[10]   If that was the holding of the
*Stiles* case, it is doubtful whether it represents the pres-
ent law of this Commonwealth.

While we are here concerned with the question of lia-
bility or immunity of public officers other than judicial
officers, it may be helpful to consider the state of the law
as to judicial officers.   "It is a principle lying at the
foundation of our jurisprudence, too well settled to re-
quire discussion, that every judge, whether of a higher
or lower court, is exempt from liability to an action for
any judgment or decision rendered in the exercise of
jurisdiction vested in him by law.   This immunity is
founded upon considerations of public policy to the end
that the administration of justice may be independent,
based upon free and unbiased convictions and not influ-
enced by apprehension of personal consequences." *Allard*
v. *Estes*, 292 Mass. 187, 189–190, and cases cited.   Some
of that same language first appeared in *Pratt* v. *Gard-
ner*, 2 Cush. 63, 69, a case of first impression on this sub-
ject, where the court also said that a judge "is not bound,
at the peril of an action for damages, or of a personal
controversy, to decide right, in matter either of law or
of fact; but to decide according to his own convictions of
right."   In *Hoosac Tunnel Dock & Elevator Co.* v.
*O'Brien*, 137 Mass. 424, 426–427, we held that the same
immunity applied to an arbitrator appointed by the
court, and suggested that it also applied to a juror.   In
*Andersen* v. *Bishop*, 304 Mass. 396, 399–400, we held
that it also applied to prosecuting officers.   To the same
effect, see *Suitor* v. *Nugent*, 98 R. I. 56.

While this court has at all times recognized and ap-
plied the rule exempting a judge from liability in dam-

---

[10] This situation is to be distinguished from our many decisions
holding that a public officer making a valid judgment or decision on a
matter within his authority is not personally liable to any person
sustaining damage as a result thereof.   See, for example, *Callender*
v. *Marsh*, 1 Pick. 418, 432–435; *Benjamin* v. *Wheeler*, 8 Gray 409,
412–414; *Denniston* v. *Clark*, 125 Mass. 216, 218-220; *Barry* v.
*Smith*, 191 Mass. 78, 87–88, and cases cited.

ages to any person adversely affected by a judgment or decision rendered by the judge in the exercise of jurisdiction vested in him by law (but see *Joyce* v. *Hickey*, 337 Mass. 118, 122–123), it has not spoken with comparable clarity and definitiveness on the immunity or liability of a nonjudicial public officer in a similar situation. In several cases it appeared that this court was attempting to give nonjudicial public officers the benefit of the same exemption or immunity from liability enjoyed by judges, but only if it could first determine that the function of the officer which gave rise to the claim for damages was either judicial or quasi judicial in nature.

In *Barry* v. *Smith*, 191 Mass. 78, the defendant municipal health authorities, faced with a smallpox epidemic, established a hospital for such cases near property of the plaintiff. The plaintiff brought an action of tort for damages allegedly caused (a) by the selection of the location for the hospital, and (b) by the negligent operation of the hospital. This court said, at p. 88, that "in fixing on the location of the hospital the defendants were exercising a discretion which the Legislature by . . . [statute] had required them to exercise as public officers. . . . Their decision on the question being *quasi* judicial or *quasi* legislative was final. It was not competent to make them liable for a mistake or for negligence in the exercise of it, that is, in the location of the hospital. . . . Evidence that the defendants were negligent and careless in locating the hospital was rightly excluded." [11]

In the *Stiles* case, as we have already noted above, the opinion refers to the rule exempting judicial officers

---

[11] As to the operation of the hospital, we said, at p. 89: "If the defendants were personally negligent in the maintenance of the hospital and in consequence of that negligence the hospital became a nuisance to the plaintiff's adjoining houses and land, the defendants would seem to be liable . . . provided their negligence is a misfeasance as distinguished from a nonfeasance. If they are guilty of a nonfeasance only, no action lies against them. The cases are collected in *Moynihan* v. *Todd*, 188 Mass. 301, 303, 304." See *Trum* v. *Paxton*, 329 Mass. 434, 438–439; *Desmarais* v. *Wachusett Regional Sch. Dist.* 360 Mass. 591, 593.

from liability in tort for their decisions, discusses the power of a municipal council to remove other public officers, and states, at p. 181, that the hearing and decision involved in such a removal partake of the "nature of a judicial investigation," and that "the removal by a municipal council under these circumstances is still an executive or administrative act which must be performed in this particular in a judicial manner." The opinion holds, at p. 182, that the judicial immunity is not available to the councillors because they acted "without any jurisdiction" in the matter.

In *Jaffarian* v. *Mayor of Somerville*, 275 Mass. 264, 265–266, the petitioner sought a writ of mandamus to compel the mayor to act on his application for a license to operate a miniature golf course. An auditor found that the mayor "did not act in good faith but acted most arbitrarily and capriciously in refusing to grant the license." This court described the mayor's conduct as "a tyrannical and unlawful abuse of power" and upheld the issuance of a writ ordering him to investigate the application impartially and to act upon it. The applicant then sued the mayor in tort for damages arising out of his wrongful conduct as found in the mandamus proceedings. *Jaffarian* v. *Murphy*, 280 Mass. 402. The trial judge ruled in this second case "in substance that the findings in the mandamus proceedings made a case for the plaintiffs on liability in the present action" and the jury returned a verdict for the plaintiff. This court sustained the defendant's exceptions and ordered that judgment be entered in his favor. The following language from the opinion of this court indicates the basis for its decision: "In general, parties aggrieved by rulings and orders of one exercising judicial powers must seek to have errors in the proceedings corrected by appeal or exception. They have no private action against the judge who makes erroneous rulings or decisions. . . . In cases where an official or board acting in a *quasi* judicial capacity within the scope of its authority errs, commonly the law affords an aggrieved party adequate relief by resort to one of the

extraordinary writs. . . . In passing upon applications under . . . [G. L. c. 140, § 181] the mayor is acting in a *quasi* judicial capacity and is bound to exercise his discretion impartially. . . . [P. 405.] The mayor by his improper conduct in acting within the limits of his jurisdiction could not be held to be acting in excess of his jurisdiction. . . . The defendant is not shown to have acted in such way as to render him liable to this action of tort. The plaintiff was given a remedy for the wrong done him by granting his petition for a writ of mandamus." (Pp. 406–407.)

The opinions of this court in the three cases discussed immediately above (*Barry* v. *Smith, Stiles* v. *Municipal Council of Lowell* and *Jaffarian* v. *Murphy*) indicate a common emphasis on the question whether the act of the public officer which gave rise to the action of tort for damages could be classified as either judicial or quasi judicial in nature. If it could, and if the public officer was acting within his jurisdiction, he was given the benefit of substantially the same exemption from liability given to a judicial officer. Also common to the three opinions is the absence of any attempt to decide whether the same considerations of public policy which gave rise to and justify the rule exempting judicial officers from liability for their judgments and decisions on matters within their jurisdiction also warrant and require a substantially similar rule applicable to nonjudicial public officers. We believe that they do, and that whether a public officer is entitled to the exemption should not depend on the success of an often strained and labored effort of the court to decide that the act of the public officer in some way partook of a judicial nature.

The Federal courts, starting with a rule of judicial immunity first stated in *Bradley* v. *Fisher*, 13 Wall. 335, 346–351 (1871), citing with approval *Pratt* v. *Gardner*, 2 Cush. 63 (1848), and restated in *Alzua* v. *Johnson* 231 U. S. 106, 111, have not felt inhibited from extending the rule, or from applying a substantially similar rule, to nonjudicial Federal officers. In *Spalding* v. *Vilas*, 161

U. S. 483 (1895), similar immunity was applied to the Postmaster General of whom the court said, at pp. 498–499: "He may have legal authority to act, but he may have such large discretion in the premises that it will not always be his absolute duty to exercise the authority with which he is invested. But if he acts, having authority, his conduct cannot be made the foundation of a suit against him personally for damages, even if the circumstances show that he is not disagreeably impressed by the fact that his action injuriously affects the claims of particular individuals." In *Yaselli* v. *Goff*, 12 F. 2d 396 (2d Cir. 1926), affd. per cur. 275 U. S. 503 (1927), similar immunity was extended to an assistant to the Attorney General.

One of the more frequently cited Federal cases on this subject is that of *Gregoire* v. *Biddle*, 177 F. 2d 579 (2d Cir. 1949), applying to nonjudicial Federal officers, in this case the persons serving in the office of the Attorney General, the Director of the Enemy Alien Control Unit, and the District Director of Immigration, the same rule of "absolute immunity for official acts" which is applied to judges. After reviewing the decisions cited above on judicial immunity, Chief Judge Learned Hand, writing for the court, said: "The [United States Supreme] Court had indeed already granted similar immunity to the Postmaster General [in *Spalding* v. *Vilas*, 161 U. S. 483, 498] declaring that the doctrine covered 'heads of Executive Departments'; and the Court of Appeals of the District of Columbia has extended it to a number of other executive officials, some of them by no means heads of departments."[12]  (Pp. 580–581.)

---

[12] Chief Judge Hand cited a number of cases, including the following, on this point. *Standard Nut Margarine Co. of Fla.* v. *Mellon*, 72 F. 2d 557, 559 (Ct. App. D. C.), held that although "the decision of the Commissioner [of Internal Revenue] imposing a tax upon the plaintiff's product . . . was erroneous . . . [t]he defendants are not personally liable in damages for their erroneous construction and application of the statute. We think the case is governed by the rule that the head of an executive department of the United States government cannot be held in damages for acts done by him in relation to matters committed by law to his control or supervision. It became the official duty of the Commissioner to determine whether the product

The following reasons were stated by Chief Judge Hand, at p. 581, in support and justification of the extension of "the absolute immunity for official acts" enjoyed by judges to all other public officers. "[T]o submit all officials, the innocent as well as the guilty, to the burden of a trial [on a claim for damages allegedly caused by an erroneous decision] and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. Judged as res nova, we should not hesitate to follow the path laid down in the books."

The same language of Chief Judge Hand was quoted

manufactured by the plaintiff was subject to the tax prescribed by the act. It is true that the Commissioner construed the statute erroneously, but nevertheless the subject-matter of the assessment was within his jurisdiction and authority. In such case error on his part does not expose him to an action for damages, and this is none the less true even though his error be described as arbitrary, capricious, and malicious." In *Lang* v. *Wood*, 92 F. 2d 211, 212 (Ct. App. D. C.), the plaintiff sought damages from the members of the parole board for allegedly revoking his parole without affording him a prior hearing before the full board to which he claims he was entitled. The court sustained a demurrer on the ground "that the acts complained of were official acts of the defendants, performed as United States officers on and concerning matters within their official jurisdiction." The court said at p. 212: "In our opinion the hearing of the revocation of plaintiff's parole in the present case was a subject matter committed by law to the executive control of the defendants as public officers, and in such case error on their part does not expose them to an action for damages, and this is none the less true even though their error be described as arbitrary, capricious, and malicious."

with approval by Mr. Justice Harlan in *Barr* v. *Matteo*, 360 U. S. 564, 571–572. This was a libel suit against the Acting Director of the Office of Rent Stabilization based on a press release issued by him criticizing action which had been taken by two of his subordinates and stating his intention to suspend the subordinates. The opening statement of the opinion was: "We are called upon in this case to weigh in a particular context two considerations of high importance which now and again come into sharp conflict — on the one hand, the protection of the individual citizen against pecuniary damage caused by oppressive or malicious action on the part of officials of the Federal Government; and on the other, the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or ill-founded damage suits brought on account of action taken in the exercise of their official responsibilities."

The court disposed of the case on the basis of the latter alternative and sustained the defendant's "plea of absolute privilege in defense of the alleged libel." The court said that this absolute privilege was not "restricted to executive officers of cabinet rank, and in fact it never has been so restricted by the lower federal courts . . . [citing cases thereon], [that] [t]he privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government . . . [and that] [i]t is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted — the relation of the act complained of to 'matters committed by law to his control or supervision,' . . . which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits." (Pp. 572–574.)

That the immunity applies equally to decisions which the public officer is required to make and to those he is permitted to make is clear from the following language of the court, at p. 575: "That petitioner was not *required*

by law or by direction of his superiors to speak out cannot be controlling in the case of an official of policymaking rank, for the same considerations which underlie the recognition of the privilege as to acts done in connection with a mandatory duty apply with equal force to discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority."

The decisions of several other New England States follow the same pattern as those of Massachusetts in applying the rule of immunity applicable to judicial officers to nonjudicial officers performing a judicial or quasi judicial function within the limits of their authority.

In *Sweeney* v. *Young*, 82 N. H. 159 (1925), the court said, at p. 160: "Regarding the liability of the members of the [school] board who took part and acted, the principle that 'All judicial officers, when acting on subjects within their jurisdiction, are exempted from civil prosecution for their acts' (*Evans* v. *Foster*, 1 N. H. 374, 377) has been generally extended in this state to apply to the acts and conduct of all public officers in their exercise of judicial authority. 'Whenever public officers are performing judicial duties their liabilities are determined by the rules of law applicable to a judicial officer.' *Sargent* v. *Little*, 72 N. H. 555, 556, 557." The court said further, at pp. 163–164: "The public interest that public officers shall be 'free and fearless' in the exercise of their judicial duties makes it of immaterial bearing on their liability for their judicial acts whether or not they act from good motives. Their obligation to do justice being owed to the state rather than to the parties coming before them, malice gives the parties no more right to sue them than an honest error subjecting the act to reversal. Judicial acts do not lose their character as such because malice induces them, and it is not of consequence whether the act is free from error or irregularity except for the malice or whether there is involved some error or irregularity in addition to the malice, and if so, whether or not the malice accounts for it. The judgment being rendered

by an authorized tribunal, the tribunal incurred no civil liability in rendering it."

*Nadeau* v. *Marchessault*, 112 Vt. 309 (1942), involved a claim for damages against an overseer of the poor for allegedly "carelessly, negligently and maliciously" failing to provide adequate assistance to the plaintiff and his family. The court held, at pp. 311–312, that "the function that an overseer performs in the discharge of this duty is not ministerial but judicial in nature, because it involves an inquiry of fact and the exercise of judgment and discretion upon the case presented," and that "[w]here a public officer performs a judicial function involving the exercise of judgment and discretion, and acts within the limits of his authority, he is not liable for negligence in the execution of his duty at the suit of a private individual claiming to have been injured thereby." The opinion concluded by stating and approving, at p. 313, the doctrine that "[p]ublic policy requires that public officers shall be permitted to perform their discretionary duties without fear of being harrassed by suits for damages claimed to arise by reason of their improper motives."

In *Richards* v. *Ellis*, 233 Atl. 2d 37 (Maine 1967), the municipal licensing board denied the plaintiff's application for a victualler's license and a court issued a peremptory writ of mandamus ordering the board members to grant the license. The plaintiff then brought this action against the board members for damages allegedly sustained by him by reason of their bad faith and malice in originally refusing to issue him the license. The court held, at pp. 38–39, "that the members of a municipal licensing board are immune from civil liability for quasi-judicial decisions within the scope of their authority without regard for bad faith, malice, or other evil motives," that "[t]he Board, acting within its authority to license, was not a Court to be sure, but plainly was exercising quasi-judicial powers," and that "[t]he question is whether the defendants are entitled to the absolute immunity of a judge or to an immunity conditional

upon the absence of malice or corruption. We have stated our conclusion that absolute immunity of the judge covers the members of the licensing board." The court supports its decision by quoting what it describes as "[t]he classic statement of the reasons underlying absolute immunity . . . given by Judge Learned Hand in *Gregoire* v. *Biddle* (CA 2) 177 F. 2d 579, 581," which we have already quoted above in this opinion.

Upon full consideration of all of the judicial precedents cited above, and of others too numerous to cite, we hold that the law of the Commonwealth should be, and therefore is, that if a public officer, other than a judicial officer,[13] is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority and jurisdiction, he is not liable for negligence[14] or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby. This rule is presently limited to public officers acting in good faith, without malice and without corruption. This limitation is dictated by a comparable limitation in the facts of the case which we are deciding. The plaintiff has neither alleged nor produced evidence that the defendants acted in bad faith, maliciously or corruptly. This limitation is also in accord with our holdings to date to the effect that a public officer sued in tort for libel or slander based on his official statements may defend on the basis of conditional privilege, but not absolute privilege. *Vigoda* v. *Barton*, 348 Mass. 478, 483–485.

This limitation is not intended as any indication that

[13] The sole reason for excluding judicial officers from the application of this rule is that under our decided cases they already enjoy absolute immunity from liability for acts within their jurisdiction. Their immunity is in no way affected by this decision.

[14] The word "negligence" as used in this statement is limited to the negligence of a public officer in relation to his making of an official decision involving the elements of judgment and discretion and not otherwise. For example, it clearly would not include the negligence of a public officer in the operation of a motor vehicle in the course of the performance of his official duties. See *Trum* v. *Paxton*, 329 Mass. 434, 438–439.

we have presently rejected a rule which would give public officers absolute immunity for their official decisions within the scope of their duty and authority notwithstanding any bad faith, malice or corruption in relation to such decisions, nor do we intend any present intimation whether we would or would not adopt such a rule of absolute immunity if the question were before us. We are aware of numerous decisions which have adopted such absolute immunity and of others which have not. We are also aware of support for the more limited rule which we have this day declared and adopted, and of considerable criticism, particularly in scholarly writings, of the granting of absolute immunity to public officers acting in bad faith, maliciously or corruptly. Harper and James, Torts, § 29.10. Prosser, Torts (2d ed.) 780–782. Davis, Administrative Law Treatise, § 26.04. Jaffe, Suits against Governments and Officers: Damage Actions, 77 Harv. L. Rev. 209, 218–225. Similar criticism is contained in two of the dissenting opinions in *Barr* v. *Matteo*, 360 U. S. 564, 578, 588. Lastly, we note that in *Jaffarian* v. *Murphy*, 280 Mass. 402, although the trial judge had found that the mayor, in rejecting an application for a license, "'. . . did not exercise good faith, did not give it his fair consideration, but was most arbitrary and capricious] in exercising his discretion,'" (p. 404) and although this court characterized the mayor's action as "not acting in good faith and . . . abusing his power in a tyrannical and unlawful manner" (pp. 405–406) we nevertheless ordered that judgment be entered for the defendant for the reasons that the "findings do not fairly import corrupt conduct," and that there was no proof "of a purpose [by the mayor] to benefit himself or others at the expense of the applicant or to do malicious injury to him." (P. 408.) See 56 Mass. L. Q. (No. 1) 79, 81–83. Since none of the varying versions of the rule as applied in the decided cases, except the *Stiles* and *Ashton* cases, *supra*, permits recovery against a public officer on mere proof of negligence or error in the making of a decision involving the element of

judgment or discretion, and since we have no more than that in this case, no useful purpose would be served presently by speculating or contemplating what our decision would be if the facts were different.

We have intentionally avoided use of the words "judicial" and "quasi judicial" in our statement of the rule and in discussing the types or areas of decisions or conduct of public officers covered by the rule. We thus reject the holdings, or at least strong implications, of many former decisions to the effect that a public officer could enjoy immunity from liability only with respect to decisions or conduct which were either "judicial" or "quasi judicial" or which partook of the "nature of a judicial investigation." *Stiles* v. *Municipal Council of Lowell*, 233 Mass. 174, 181–182. It should not be, and it is not necessary to strain to find, or to seem to find, a vestige of a judicial function to accord immunity to a nonjudicial officer. His protection against suits by individuals claiming to have been damaged by his official decisions which are invalid for error should not be limited by the extent to which the cloak of judicial immunity can be stretched to reach or cover him. He is entitled to the protection of a separate cloak of immunity, which is adequate, for the purpose of the present case, to preclude liability for mere negligence or errors in the exercise of judgment and discretion in the discharge of his duties.

We take notice of the ever increasing body of public officers, both at the State and the municipal level of government, who are armed with the authority and charged with the responsibility for making a large number and variety of important policy and other decisions involving judgment and discretion which are neither judicial nor quasi judicial in nature. They are more correctly described and classified as either executive or administrative decisions, and they may directly or indirectly affect individuals or large segments of the community in material respects. An appropriate example of such public officers whose decisions affect almost all inhabitants of the Commonwealth is that of the Commissioners of the

Department of Public Utilities (G. L. c. 25, § 2) who have broad power to regulate the operations of public utility companies with particular reference to the rates charged by them to their customers (G. L. c. 164, § 94). In *Opinion of the Justices*, 251 Mass. 569, 610–611, and again in *Lowell Gas Co.* v. *Department of Pub. Util.* 324 Mass. 80, 87, we said: "The making of rates may be treated as a legislative or executive function." In *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 327 Mass. 81, 85, we said: "It is elementary that the fixing of rates is not a proper judicial function."

Not infrequently decisions and orders made by the Commissioners of the Department of Public Utilities are reviewed by this court,[15] and not infrequently this court, acting either by a single justice or as a full court, has found such decisions and orders to be invalid for various reasons, other than bad faith, malice or dishonesty on the part of the Commissioners. It is unthinkable that the Commissioners should be subject to liability to utility companies or individuals adversely affected by such invalid decisions or orders simply because they are not judicial or quasi judicial in nature. It is unnecessary to attempt to identify and list the many other public officers whose positions, authority and responsibility are similar to those of the Commissioners of the Department of Public Utilities and who would be similarly affected by any rule imposing liability in damages resulting from their official but non-judicial decisions later held invalid for reasons other than bad faith, malice or corruption. The judicial-nonjudicial distinction is not a sound reason for immunizing public officers making the former type of decision but exposing those making the latter type.

The remaining question requiring our consideration is whether the defendants in this case were acting within their jurisdiction as councillors in making the decisions

---

[15] Such review is often on an appeal under G. L. c. 25, § 5, but it may also be in proceedings for declaratory relief under G. L. c. 231A. For an example of the latter, see *Cambridge Elec. Light Co.* v. *Department of Pub. Util, ante*, 474, 502–504.

and in doing the acts which form the basis of the plaintiff's claim for damages.   We hold that they were.

It is beyond question that under G. L. c. 43, § 89, the city council had power and authority to remove the plaintiff as city manager for cause by a two-thirds vote.   As already noted above in this decision, the plaintiff, on request, was entitled to receive a written statement of the reasons alleged for his removal, and he was never given such a statement by the city council as distinguished from the statement given him by the five defendants.   This brings us to the question whether the defendants' failure to comply with this provision of § 89 means that they were acting without jurisdiction and are therefore deprived of immunity for their acts.   We hold that it does not.

We are aware that on facts very similar to those of the present case, this court reached a different conclusion in the *Stiles* case.   There we said, at p. 183, "It is plain that the defendants never acquired a jurisdiction to exercise their *quasi* judicial functions respecting the removal from office of the plaintiff, because they never notified him and never gave him a copy of the charges against him. . . . The full performance of all conditions established by the statute are essential prerequisites to the jurisdiction of the municipal council over the subject matter of the removal of an officer."   We do not agree with the last sentence quoted from the *Stiles* case.   We hold instead that although the full performance of all conditions established by the statute (G. L. c. 43, § 89) is an essential prerequisite to the validity of the defendants' attempted removal of the plaintiff as city manager, it is not an essential prerequisite to the existence of the jurisdiction of the municipal council to remove the plaintiff.   In our view what is involved here is not a question of the jurisdiction of the council to remove the plaintiff, but rather a situation where the council, having jurisdiction, erred in not following statutory procedural requirements.   It was "at most a mistake in the exercise of jurisdiction, rather than an act utterly outside of jurisdiction."   *Allard* v.

*Estes,* 292 Mass. 187, 195.   See *Lonergan* v. *American Ry. Exp. Co.* 250 Mass. 30, 41.   "The fact that the action here taken was within the outer perimeter of . . . [the defendants'] line of duty is enough to render the privilege applicable."   *Barr* v. *Matteo,* 360 U. S. 564, 575.

It is clear that the judge relied on the language in the *Stiles* case, not only in his rulings on the admissibility of evidence and in his denial of the defendants' motions for directed verdicts, but also in instructing the jury that the defendants were without jurisdiction to remove the plaintiff.   While such rulings and instructions were warranted on the basis of that decision, we no longer follow the holding of that case.   Therefore, the defendants' exceptions to the denial of their motions for directed verdicts must be sustained.

The case appears to have been fully and fairly tried on the pleadings and, therefore, in accordance with G. L. c. 231, § 122, judgment is to be entered for each defendant.[1,6]

*So ordered.*

---

[16] Having disposed of the case on other grounds, we do not reach the contention of the defendants that the plaintiff is barred from recovering by reason of the rule applied in *New York Times Co.* v. *Sullivan,* 376 U. S. 254, *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, *Rosenbloom* v. *Metromedia, Inc.* 403 U. S. 29, *Lewis* v. *Vallis,* 356 Mass. 662, *Tripoli* v. *Boston Herald-Traveler Corp.* 359 Mass. 150, *Priestly* v. *Hastings & Sons Publishing Co. of Lynn,* 360 Mass. 118, and *Twohig* v. *Boston Herald-Traveler Corp.* 362 Mass. 807.