**NEW ENGLAND CONCRETE PIPE CORP., Plaintiff,**

v.

**D/C SYSTEMS OF NEW ENGLAND, INC. et al., Defendants.**

**Civ. A. No. 75–1327–G.**

United States District Court, D. Massachusetts.

Aug. 22, 1980.

---

**18.** See n. 5, *supra*.

Donald L. Connors, Terrance J. Hamilton, David M. Roseman, Tyler & Reynolds, Boston, Mass., for plaintiff.

Arnold P. Messing, Margaret Marshall, Csaplar & Bok, Thomas E. Goode, Hale, Sanderson, Byrnes & Morton, Boston, Mass., for Massachusetts Housing Finance Agency.

John M. Reed, Phillip M. Cronin, Withington, Cross, Park & Groden, Boston, Mass., for Westinghouse.

Richard L. Seegel, Norwood, Mass., Loring A. Cook, III, Roche, Carens & DeGiacomo, Boston, Mass., for D/C Systems.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

This case came on for trial on the one count remaining in plaintiff's twelve count complaint and related crossclaims. Plaintiff, New England Concrete Pipe (New England) was the sub–subcontractor on a private housing project known as Mystic Valley Towers. By this action it seeks to recover $178,994.23 alleged to be owing for materials and labor it supplied to the project.

Plaintiff's contract was with D/C Systems, Inc., a subcontractor on the project to whom New England was to furnish precast concrete floor members at a price of $1,141,452. D/C Systems in turn had a subcontract with the Dwight Building Company, the general contractor, whose parent corporation is a wholly owned subsidiary of Westinghouse Electric Corporation. Westinghouse played a dual role on the project— it furnished what was entitled a Bond and Letter of Guarantee purporting to provide security on certain performance and payment obligations of its subsidiary, Dwight, as general contractor; [1] and it had its own sub–subcontract with D/C Systems to install bath and kitchen units. It is the bond and letter of guarantee which lies at the heart of this controversy.

The Owners of the project (also referred to as Sydney and Winn) obtained their financing through the Massachusetts Housing Finance Agency (MHFA). MHFA is a body politic and corporate organized pursuant to the provisions of St.1966, c. 708 as amended. See generally, M.G.L. c. 23A App. Its purpose is to bring together public funds and private enterprise in order to encourage the construction of housing for low and moderate income families. As lender on the Mystic Valley Project, MHFA executed a loan agreement in 1973 with the Owners, Sydney and Winn, in the principal amount of $13,311,004.

During the course of the construction project, but after plaintiff had delivered the planks to the job site, certain disputes arose concerning the quality of New England's performance. As a result, sums were charged back on the sub–subcontract and full payment was withheld by D/C Systems

---

1. The bond and letter of guarantee provided in relevant part: "Westinghouse guarantees Dwight's obligations of payment for labor performed or furnished and for material used or employed on the project . . . .. This guarantee shall continue until Dwight's obligations under the Contract have been performed."

and by Dwight, the general contractor. In August 1974 plaintiff made a demand for payment by letter to Dwight, and thereafter commenced this action. Named as defendants in the original complaint were D/C Systems, Dwight, the Owners (Sydney and Winn), Westinghouse (as guarantor of Dwight's obligations), and MHFA.

All defendants except D/C Systems moved to dismiss and Judge Skinner of this court heard arguments and received supporting and opposing memoranda. On June 13, 1979, Judge Skinner dismissed all but three counts of the complaint, holding, *inter alia*, that: (1) the Westinghouse Bond and Letter of Guarantee was not a bond within the meaning of Section 5, St.1971 c. 1030, a provision in the MHFA enabling statute,[2] and that, accordingly, plaintiff had no direct right of action on Westinghouse's guarantee; (2) plaintiff was not an intended beneficiary of Dwight's contract with the Owners and could not proceed directly on the contract against Dwight or the Owners;[3] and (3) a cause of action would lie all the same against MHFA on the allegation, implicit in Count X, that MHFA negligently failed to require the Owners to furnish a bond or escrow agreement complying with Section 5, St.1971, c. 1030, which would have secured payment for the labor and materials plaintiff supplied to the project. D/C Systems neither answered nor moved on the pleadings. By the time suit had commenced in 1975 D/C Systems was insolvent and, in light of its default, judgment entered against it on April 1, 1980 for the full amount of plaintiff's damages, plus interest.[4]

Judge Skinner's ruling left three counts for further proceedings in this session of the court. Two of the counts had only been conditionally sustained by Judge Skinner and we granted summary judgment for the defendants on those counts when plaintiff failed to present evidence of an express independent agreement by the Owners or Dwight to pay for plaintiff's work. This left only Count X. Plaintiff thus proceeded to trial on the sole issue of whether MHFA had negligently breached a duty owed to plaintiff and other materialmen on the project, to provide a bond or equivalent escrow complying with Section 5.

In February 1980, MHFA answered and cross–claimed against the Owners, Dwight and Westinghouse. The Owners, in turn, cross–claimed against Westinghouse and Dwight. In substance, the cross–claims assert that if MHFA (or the Owners, with respect to their independent cross–claims) is found liable to plaintiffs in the amount of the unpaid labor and materials, then (1) Dwight is liable over to MHFA on its contract with the Owners, of which MHFA is an intended beneficiary; (2) the Owners are liable over to MHFA on the terms of their loan agreement with MHFA which required the Owners to furnish a payment bond; and (3) Westinghouse is liable over to MHFA on the Bond and Letter of Guarantee which was addressed to MHFA and which guaranteed Dwight's obligations to pay for labor and materials supplied on the project. In this posture the case proceeded to trial.

### New England's Performance on its Sub–subcontract

Preliminary to any question of MHFA's negligence, plaintiff must show that it fully performed its contract with D/C Systems. The amount plaintiff can claim in damages against MHFA turns on this determination.

New England's contract with D/C Systems was to furnish and install precast concrete floor planks for a contract price of

---

2. Codified at Mass.G.L. c. 23A app., § 1–5.

3. On plaintiff's motion to reconsider, Judge Skinner reaffirmed this holding in light of the intervening decision of the Supreme Judicial Court in *Choate, Hall & Stewart v. SCA Services, Inc.*, —— Mass. ——, 1979 Mass.Adv.Sh. 1877, 392 N.E.2d 1045, which expanded the rule on third party beneficiaries in the Com-

monwealth. (Order Denying Reconsideration, Skinner, J., October 29, 1979).

4. At trial it was explained that D/C Systems was basically a shell corporation created as a licensee of Descond Concordia, Ltd. in order to take advantage of the Department of Housing and Urban Development's Section 236 subsidy funds.

$1,141,452. The project specifications required the surface of the planks to be a "standard finish", acceptable to receive carpet—"small surface holes (less than $\frac{1}{4}$") caused by air bubbles, minor chips and spalls will be tolerated, but no major or unsightly imperfections, honeycomb, ridges, voids or depressions will be permitted." The project architect, Alan Haven, determined conformance to specifications. In one instance, New England acknowledged certain imperfections in the finish, and it accepted a backcharge in the amount of $7,293.61. The major dispute, however, involved corrective work in the amount of $48,700.

In October of 1973, Haven, and other field inspectors on the project called to the attention of D/C Systems and Dwight the poor quality of the surface on the floor slabs, most of which had already been delivered to the job site by plaintiff. Dwight was instructed by Haven to correct the deficiencies and, to that end, plaintiff attempted to grind down sample planks to meet specifications. Still not satisfied with plaintiff's efforts, Haven recommended that $50,000 be withheld on Dwight's contract until the slabs were made ready to receive carpeting. Ultimately, Dwight had the flooring contractor, Allegheny Flooring, Inc., make the necessary corrections, which involved filling the voids and depressions with a plaster–like substance called levelastic. Dwight paid $48,700 for that work and backcharged D/C Systems in that amount. The backcharge, passed through by D/C Systems to plaintiff, is still disputed by plaintiff who has here included the $48,700 in its claim for damages.

We find the corrective work ordered by the project architect was necessary to bring the floor slabs into compliance with the controlling specifications. Although plaintiff failed to perform the corrective work, we find that plaintiff substantially performed under the terms of its contract with D/C Systems. The floor planks were not primarily flooring, but load–bearing integral parts of the shell of the building. They were fabricated with the "Standard Finish" required by the specifications. The imperfections in the surface which was to receive carpeting were relatively minor, but sufficient to necessitate the corrections ordered by the architect. The plaintiff made a good faith effort to perform the contract completely. See *Albre Marble & Tile Co., Inc. v. Goverman*, 1968, 353 Mass. 546, 549–550, 233 N.E.2d 533. The $48,700 incurred by Dwight to have the levelling compound applied was a reasonable sum for the labor performed and the work that had to be done. Accordingly, plaintiff's recovery on its principal claim shall be reduced by $48,700, the cost of remedying the defective work. *See generally, James V. Caggiano & Son, Inc. v. Gosthanian*, 1968, 42 Mass.App. Dec. 31.

### Westinghouse Bond and Letter of Guarantee

Section 5 of the MHFA enabling statute requires the sponsor of a MHFA financed project (here Sydney and Winn) to furnish security in the form of a bond or escrow to protect suppliers of material and labor. The relevant portions of Section 5 read as follows:

On all construction loans for the construction of eleven or more dwelling units the MHFA shall require (1) . . . and (2) a bond furnished by the sponsor or an equivalent escrow arrangement with the sponsor and supervised by the MHFA to assure payment out of the construction loan funds for all labor and materials for which claimants would have been able to claim a mechanic's lien if the claimant had complied with the provisions of chapter two hundred and fifty four.

Mass.G.L. c. 23A App. § 1–5.

Section 5 thus describes the acceptable forms of security–a bond or "equivalent escrow arrangement"–and the class of suppliers and materialmen this security is intended to protect–claimants who would have been able to claim a mechanic's lien by complying with M.G.L. c. 254. Chapter 254 is the mechanic's lien statute. It contains the rules of eligibility and procedure for executing and enforcing liens on privately owned construction projects.

Section 5 was amended in 1971 to read as it does in its present form. The bill before the legislature containing the amendment was entitled: An Act Providing for Payment of Prevailing Wages and for Payment Protection in the Construction of Certain Projects Financed by Loans Made by the Massachusetts Housing Finance Agency. The title leaves little doubt that the act is remedial in nature; its purpose generally to protect suppliers of labor and materials to MHFA financed projects. Accordingly we read its provisions broadly in order to give full effect to the legislative intent. *See* M.G.L. c. 23A App. § 1–16; *Johnson Foster Co. v. D'Amore Const. Co.*, 1943, 314 Mass. 416, 420, 50 N.E.2d 89. *Cf. Waite Hardware Co. v. Ardini & Pfau, Inc.*, 1959, 339 Mass. 634, 638, 162 N.E.2d 13.

■ Section 5 defines the class entitled to the security's protection in the conditional–those claimants who *would* have been able to claim a lien *if* they had complied with chapter 254. On the Mystic Valley Project, New England's position in the chain of contract, a sub–subcontractor, made it eligible to take advantage of chapter 254's protection, had chapter 254 applied to this project. *See* c. 254, § 4. That alone brought New England within the protected class of Section 5–under the plain language of Section 5 no further qualifications nor conditions precedent need have been met to entitle New England to protection under the statute. If we are to give any meaning to the conjunction "if," we must concluded that New England did not first have to file notice of lien, or take any other preliminary steps in the nature of a chapter 254 proceeding, in order to maintain an action on the bond or security posted by the sponsor.

■ Hence, one of the defining characteristics of a security arrangement that complies with the MHFA statute is that, like a general surety bond, it provides a direct right of action to the protected supplier or laborer. It has been the previous ruling of the court in this case that no direct right of action can be implied in the Westinghouse bond and letter of guarantee. (Memorandum and Order, Skinner, J., June 13, 1979, at p. 4). The instrument is neither a surety bond within the meaning of chapter 149, § 29 or § 29A, nor is it a common law payment bond; and we do not consider it in any way "equivalent" to a bond as something loosely denominated an escrow arrangement. As described at trial by witnesses who were party to the negotiations, the Westinghouse letter of guarantee was designed to substitute for the traditional surety's bond in order to save considerable cost of a surety's premium. In the course of drafting the letter, the scope of the guarantee was intentionally narrowed to cover only the immediate debts of Dwight. It was agreed among the parties that materialmen not in privity with Dwight but who could otherwise have qualified under chapter 254 (and, hence, under a properly drafted section 5 bond) would be protected by a provision to be included in all subcontracts requiring each subcontractor to "bond off" liens as they were filed by the sub–subcontractors.[5] By this device, second and third tier suppliers were thus required to first file a lien on the project in order to trigger the protection of being bonded off.

■ As we noted *ante*, however, it is our view that *filing a lien or other notice of claim is not prerequisite to qualifying under section 5 for the security's protection or suing directly on the bond.* Moreover, it appears that nothing in plaintiff's sub–subcontract with D/C System would have apprised plaintiff that it must follow the lien and bonding off device to obtain security on this project. Article 7.2 of the contract between plaintiff and D/C System required plaintiff to bond off any liens filed by its own suppliers (sub–subcontractors). That alone did not put plaintiff on notice that the same procedure governed its relationship with D/C Systems–it might have assumed, for example, that its suppliers need-

---

**5.** For example, article 11 of the contract between Dwight and the Owners provided:

. . . contractor further agrees that in the event any subcontractor or material supplier of any tier places a lien against the project, that Contractor shall within ten (10) days after the filing of such lien, file with the *Registry of Deeds such bond as is necessary* to release such lien, pursuant to the provisions of Mass.G.L. c. 254.

ed special protection because they fell outside the ambit of c. 254. In Article 7.3 of D/C Systems' contract with Dwight there does appear a bonding off provision, i.e., D/C Systems shall bond off liens filed by sub–subcontractors, which would have protected plaintiff if it had known it existed. But, as the president of New England testified, it was not his practice to look at contracts between the parties further up in the chain of contract. Thus, under any construction of its terms, this hybrid security arrangement cannot be held to comply with the bonding provisions of section 5 of the MHFA statute.

## Negligence

The theory upon which Judge Skinner sustained Count X of the plaintiff's cause of action was that MHFA owed a duty to furnishers of labor and materials, such as plaintiff, to require from the owner a bond or escrow arrangement complying with the terms of section 5, St.1971, c. 1030. MHFA breached its duty when it agreed to accept the non–complying Westinghouse letter of guarantee in lieu of a Section 5 bond. If MHFA is found to have been negligent in its breach it may be held to respond in damages in the amount New England would have been able to recover had a properly executed bond been posted.

Paragraph 17 of the loan agreement between MHFA and the Owners required the Owners to obtain from the general contractor a 100% performance and payment bond complying with M.G.L. c. 149, § 29.[6] This presented two problems for Dwight. The premium on a commercial bond would run at least $35,000, and it was likely that any commercial surety would insist that D/C Systems, as subcontractor, also post a bond.

Because it lacked real assets, D/C Systems was believed to be unbondable. Dwight thus proposed that a letter of guarantee from its parent corporation, Westinghouse, be given in lieu of the bond. A draft letter of guarantee was prepared by the Owners' legal counsel and submitted to William Haynsworth, counsel for MHFA, for his review and approval. Haynsworth in turn discussed the letter of guarantee with the other principals on the project–Dwight, D/C Systems, and the Owners. As a result of these discussions the scope of the payment guarantee was narrowed to extend only to Dwight's immediate obligations of payment–not to the obligations owed by subcontractors to sub–subcontractors such as plaintiff, or to any other suppliers who did not deal directly with Dwight.[7]

The final version of the Westinghouse guarantee was reviewed by Haynsworth who also sought the opinion of Richard L. Seegel, counsel for and official of D/C Systems. By letter to the MHFA dated February 16, 1973, Seegel concluded that,

it is my opinion that the Westinghouse letter of guarantee does protect the MHFA and the Owner at least to the same extent that a normal surety company bond would, and therefore, the acceptance of this letter of guarantee should not violate your statutory obligations.

At trial, Seegel characterized his opinion as "hedged" and, in light of the informal nature of the letter, not intended to be a conclusive legal opinion. On February 14, 1973, MHFA had accepted the Westinghouse letter of guarantee and closed on the construction loan agreement. Thereafter, the Owners executed a general contract

---

**6.** M.G.L. c. 149, § 29, contains the bonding provisions for public projects. The original MHFA enabling statute (St.1966, c. 708) had required the sponsor to provide a c. 149, § 29 bond–apparently in the mistaken belief of the legislation's drafters that MHFA projects were public projects. The 1971 amendment, St.1971, c. 1030, thus eliminated the need for the complex filing and notice procedures associated with security on public projects. It appears that the loan document executed between the Owners and MHFA was an old document from the pre–c. 1030 days; hence the requirement found in paragraph 17 that the Owners post a c. 149, § 29 bond.

**7.** Compare the first draft of the payment guarantee–Westinghouse guarantees that Dwight "shall pay for all labor performed or furnished and for all material used or employed pursuant to said contract"–with the language ultimately adopted–Westinghouse guarantees "Dwight's obligations of payment for labor performed or furnished and for material used on the project." (Plaintiff's Exhs. 2, 7).

with Dwight in the amount of $10,454,857 for construction of the project.

■ We turn now to the standard by which we should judge the conduct of MHFA in carrying out its statutory duty. Because MHFA is an agency of the state we must first consider the question of governmental immunity and the agency's asserted defense (or privilege) of good faith in carrying out its statutory duty. The MHFA enabling statute states that MHFA has the power to sue and be sued. Mass. G.L. c. 23A app. § 1–4. That section amounts to a legislative waiver of the state's sovereign immunity, *see Forman v. Community Services, Inc.*, 2 Cir. 1974, 500 F.2d 1246, 1256, rev'd on other grounds, sub nom. *United Housing Foundation v. Forman*, 1975, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621, and defendant does not argue otherwise. The more difficult question is whether any immunity–related defenses remain after sovereign immunity has been waived. For example, had plaintiff named only officers of MHFA, in their individual capacities, as defendants, they would not be held liable for their negligence unless shown to have acted in bad faith or maliciously. This is the rule stated in *Gildea v. Ellershaw*, 1973, 363 Mass. 800, 298 N.E.2d 847.

In *Gildea*, the Supreme Judicial Court examined at length the history of absolute immunity accorded judicial officers and concluded that a qualified immunity should extend as well to nonjudicial public officers. The defendants, five former members of the Brockton city council, had removed the plaintiff city manager from office without complying with certain statutory procedures for hearing and notice. Plaintiff had neither alleged nor introduced evidence that the defendants had acted in bad faith or with malice. In holding the defendants were not liable for their failure to comply fully with the statutory procedures for removing the city manager, the court adopted the following standard of liability:

> [I]f a public officer . . . is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby. This rule is presently limited to public officers acting in good faith, without malice and without corruption.

363 Mass. at 820, 298 N.E.2d at 858.

This rule of personal immunity for acts by public officials in good faith, without malice, has been followed in other cases, relying on *Gildea*. *See Sherman v. Rent Control Bd. of Brookline*, 1975, 367 Mass. 1, 7, 323 N.E.2d 730; *Middlesex & Boston St. Ry. Co. v. Board of Aldermen of Newton*, 1977, 371 Mass. 849, 861, 359 N.E.2d 1279. But these cases do not decide whether the immunity of public officers for "mere errors of judgment" extends as well to the public agency that employs them. Although it is clear after *Gildea* that Haynsworth could individually have raised the defense of good faith, it is not clear whether MHFA's defenses are co–extensive with those of its officers.

In *Middlesex & Boston Ry.*, plaintiff named the members of the board of aldermen as defendants in their individual capacities. Applying the *Gildea* rule, the court held that although the defendants had imposed an invalid condition on plaintiff's building permit, the defendant board members could not be held to respond in damages because they had not acted in bad faith, maliciously or corruptly. In what might appear, on first reading, to extend the personal, good faith immunity of the aldermen to the city, the court further concluded: "There appears to be no basis for imposing liability either on the members of the board personally or on the city." 371 Mass. at 861, 359 N.E.2d at 1286. But a careful reading of the court's opinion casts doubt on its applicability to the instant case. In *Middlesex & Boston Ry.*, the members of the board escaped liability by raising their *Gildea* defense of good faith immunity, whereas the city escaped liability for reasons unrelated to the immunity of

the aldermen. At issue was a zoning restriction on plaintiffs' proposed apartment development. Had the town of Newton imposed the contested restriction through the appropriate bylaw or ordinance, it would have been a valid restriction. But because it was imposed by the board of aldermen sitting as a special permit authority and not as the town's legislative body, the restriction was held invalid. The aldermen were not authorized by the city to impose such conditions on building permits and hence the acts of the aldermen were held to be not the acts of the municipal legislative body. The case is thus inapposite with the more typical fact situation, with which we are here presented, where the acts of the public officers (Haynsworth et al.) are deemed to be the acts of the employing agency (MHFA) and the latter seeks to invoke the former's defenses.

We therefore treat the matter of MHFA's good faith defense as still an open question. We have found no case law precisely on point. The Restatement (Second) of Torts discusses the differences between the officer's tort immunity and that of his government in terms of the differing purposes served by permitting the good faith defense, as follows:

> When general tort immunity of a government has been abrogated, whether by court or legislature, this has not necessarily meant a corresponding change in the officer's liability. Even when the test is expressed in the same language, as in the availability of an immunity for the exercise of a discretionary function, its application to fact situations may prove different, depending on whether the action is brought against the government or the officer. "With respect to some government functions, the threat of individual liability would have a devastating effect, while the threat of governmental liability would not significantly impair performance." An officer may have a privilege so that he is not liable if he acted reasonably. To require him to be right would seriously affect his effectiveness. But the injured party sustains real injury when the officer acted incorrectly, even though he was reasonable. It may ap-

pear just that the government should compensate for that injury.

Restatement (Second) of the Law of Torts, (1979) § 895D, comment j.

We see no compelling policy reasons not to hold MHFA to the standards of liability that govern private acts of negligence. The duty breached by the defendant is explicitly defined by the statute. The persons to whom the duty extends are few in number and readily identifiable. There is not the broad and undifferentiated class of possible plaintiffs that is affected by less specialized or routine government activity. In this regard, Professor Davis comments in his treatise on administrative law that once the state assumes the responsibility to perform a governmental function, it should be held liable for its negligent acts or omissions:

> For instance, the only obligation a state has for building highways and erecting traffic signs is a self-imposed obligation, but once the obligation is assumed the state should be liable for its negligent acts or omissions. When the state assumes the responsibility for marking dangerous curves on highways, drivers know of and rely upon that responsibility. Therefore the state should be liable when it fails to mark a dangerous curve . .

3 K. Davis, Administrative Law Treatise § 25.14 (1958 & Supp.1970).

Finally, we find support for our analysis in the recent decision of the Supreme Court in *Owen v. City of Independence, Missouri*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673, 1980, which makes clear that there is nothing in the common law that extends to a local government body the good faith immunity of its public officers. *Owen* is properly restricted to suits against municipalities for damages under 42 U.S.C. § 1983. But its holding, that municipalities sued for damages under section 1983 for constitutional violations are not entitled to qualified immunity based on the good faith of their officials, turns on the distinction we here draw between the liability of the government agency and the liability (and defense to liability) of the public officers it employs.

Under circumstances similar to those found in *Gildea,* the plaintiff in *Owen,* a city manager of the respondent city, was fired allegedly in violation of his constitutional right to due process. The Court found no tradition of immunity for municipal corporations in the common law and concluded that considerations of public policy and the purpose of section 1983 justified its holding that the municipality could not assert the good faith of its officers as a defense to liability under section 1983.

Doctrines of tort law have changed significantly over the past century, and our notions of governmental responsibility should properly reflect that evolution. No longer is individual "blameworthiness" the acid test of liability; the principle of equitable loss–spreading has joined fault as a factor in distributing the costs of official misconduct.

We believe that today's decision, together with prior precedents in this area, properly allocates these costs among the three principals in the scenario of the § 1983 cause of action . . . .. The innocent individual who is harmed by an abuse of governmental authority is assured that he will be compensated for his injury. The offending official, so long as he conducts himself in good faith, may go about his business secure in the knowledge that a qualified immunity will protect him from personal liability for damages that are more appropriately chargeable to the populace as a whole. And the public will be forced to bear only the costs of injury inflicted by the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." [citation omitted].

445 U.S. at 657, 100 S.Ct. at 1419.

A recent decision by the Eighth Circuit Court of Appeals illustrates *Owen* s application to the more commonplace business of city zoning. In *Gorman Towers Inc. v. Bogoslavsky,* 8 Cir., 1980, 626 F.2d 607, the city's board of.directors was held absolutely immune from damages arising out of their decision to rezone the site of a proposed home for the elderly. The court explained that the apparent harshness of the rule of absolute immunity for legislative acts is mitigated by the holding in *Owen* that the city has no immunity at all. Permitting personal immunity for the public officer and none for the public agency provides plaintiffs with an effective remedy for real injuries, places an additional check on unlawful behavior by public officials, and yet advances the public's interest in having government officials exercise their judgment and discretion free of the threat of personal liability. *See* 626 F.2d at 614. We therefore see no reason to depart from the general rule, followed by Judge Skinner in his June, 1979 memorandum of decision, that where the law imposes on the agency and its officers an affirmative duty in which private individuals have a special interest, the agency may be held liable for any injury that is the proximate result of the agency's negligence or misfeasance in performing its duty.

Notwithstanding our conclusion that MHFA enjoys no defense based on its good faith in complying with the section 5, defendant argues that the failure of a public authority to require a statutory bond should not give rise to a cause of action against the agency by an injured supplier. Defendant relies on *Haskell Lemon Construction Co. v. Independent School District,* Okl., 1979, 589 P.2d 677, but we distinguish the case on its facts and on the unique nature of the Oklahoma bonding statute construed in that case. In *Haskell Lemon* the court held that the defendant school district was not liable to unpaid materialmen when it failed to secure the statutorily required payment bond on a public project it had authorized. The court relied for its holding on the earlier case of *American Casualty Co. v. Town of Shattuck,* W.D.Okl.1964, 228 F.Supp. 834, and in that case we see how the Oklahoma bonding scheme differs from the bonding statutes here at issue.

By the terms of the Oklahoma statute the payment bond was a contract between the surety and the state of Oklahoma. The public entity that owned the project, in that case the school district, was by the statutory scheme "carefully divorce[d] or insulate[d] . . . from any involvement in

such payment bond or its procedural aspects." 228 F.Supp. at 840. Moreover, the Oklahoma statute placed the duty to take the bond on the individual public officer involved, not on the public entity—a distinction applied by the court in holding that unpaid suppliers could not collect from the school district that had authorized the project. MHFA, by comparison, is not purposely insulated from the bonding process. Unlike the school districts in *Haskell Lemon* and *American Casualty*, or the various public entities that were defendants in other cases here relied upon by the defendant, MHFA was more than a passive lender or sponsor. It was actively involved in financing the Mystic Valley project; it had approval authority over payments to sub–subcontractors; and the enabling statute specifically placed on MHFA the duty to require a bond from the borrower and to supervise payments out of escrowed funds.

From the history of the negotiations leading up to acceptance of the Westinghouse letter of guarantee we conclude that MHFA was negligent in carrying out its statutory duty. The first draft of the guarantee was narrowed in order to restrict direct rights of action to only those suppliers in privity with Dwight. The contrivance of bonding off lower tier lienors was simply inadequate to provide the scope of protection contemplated by Section 5. MHFA knew that it was deviating from past (and more conservative) practice when it agreed to waive the c. 149 bond required in paragraph 17 of the loan agreement. This was, after all, a novel issue for MHFA officials. It was the first time they had relied on a letter of guaranty to meet MHFA's statutory obligation to protect suppliers. Occasional past practice may have been to rely on a letter of credit, but even that precedent is of dubious legality and counsel was never consulted in the instances in which it was used. The prudent course would have been to seek independent counsel. In weighing the legal adequacy of the Westinghouse letter as substituted security, MHFA should not have relied on the tentative opinions of counsel for Dwight and D/C Systems—two companies that stood to profit most from substituting the West-

inghouse letter for the more expensive surety's bond. And since MHFA knew that the system of liening and bonding off was essential to the protection of second and third tier contractors, it was under a further duty to warn subcontractors that Mystic Valley was not bonded in the ordinary way. To the contrary, Seegel, of D/C Systems, told subcontractors that the Westinghouse letter was "in effect" the bond on the project. This essentially ad hoc and haphazard approach by MHFA to the very important matter of supplier protection is further revealed in the outdated reference to c. 149 in the loan agreement, and in the provision in Article 11 of Dwight's contract with the Owners calling on Dwight to supply a guarantee of "payment to all subtrades"—an obvious inconsistency (described by one witness as an "oversight") with the final understanding of the parties that the guarantee would not extend beyond Dwight's first tier of subcontractors.

It may be, as argued by the defendants, that New England mistakenly thought this was a public project so it could rely on a c. 149 bond for payment protection. However we do not consider that mistake to defeat proximate causation or to raise an issue of contributory negligence. In our view, when section 5 was amended the legislature intended to maintain a level of payment security equivalent to that provided by the pre–1971 statute (a c. 149 bond). The amendment only redefined the security arrangement in light of the apparently new understanding by the legislature that MHFA projects were private, not public projects. Despite the changed language, a payment bond at least as effective in protecting suppliers as a c. 149 bond still had to be furnished on a MHFA project. Assuming that Maniace, the president of New England, was mistaken in thinking this was a public project, he was not mistaken in thinking that pursuant to section 5 some sort of payment bond, with a direct right of action, had been provided by MHFA for his protection. Similarly, it cannot be contributory negligence for plaintiff to fail to lien on the project in order to be bonded off—the statute never intended that a supplier first

file a lien to be eligible for section 5 protection; plaintiff was justified in assuming some kind of direct action bond had been furnished; and plaintiff had no notice that the letter of guaranty would only protect sub–subcontractors who followed the lien and bonding off procedure.

Plaintiff, New England Concrete Pipe, reasonably relied on MHFA to fulfill its statutory duty to provide proper security on the Mystic Valley Project. MHFA's negligent failure to comply with the statute was the proximate cause of plaintiff's lost right to proceed directly on a bond to recover for unpaid labor and materials. Accordingly, judgment for plaintiff on its claim for damages in Count X of this action will be granted in the amount of $130,294.23.[8]

### MHFA's Cross–claim Against Owners

■ MHFA bases its cross–claim against the Owners on the terms of the loan agreement. A number of provisions in the loan agreement refer to liens against the project and the Owners' assignment of rights in the bond or escrow arrangement. See, for example, paragraphs 6, 7(c), and 12. For the most part, however, these provisions are significant only when read in context with paragraph 17 of the loan agreement–the provision that requires the Owners to arrange for a chapter 149, § 29 bond. In its loan agreements, MHFA relies primarily on provisions such as paragraph 17 in order to protect materialmen on its projects and to comply with whatever bonding requirements are imposed upon it by law. Therefore, to the extent the terms of paragraph 17 are modified, all other terms in the contract relating to liens or bonds are similarly modified.

By accepting the Westinghouse letter of guarantee in lieu of a section 149 bond (or qualifying Section 5 bond), MHFA materially modified the terms of the Owners' performance under the loan agreement. The MHFA statute places the duty for securing a proper bond on MHFA, not on the Owners. The Westinghouse letter of guaranty,

when accepted by MHFA, was in effect substituted performance on paragraph 17 of the loan contract. Having fully performed under the terms of their loan agreement with MHFA, the Owners cannot now be held to indemnify MHFA for its negligence in accepting as full performance a guarantee that did not comply with the statute.

### MHFA's Cross–claims Against Dwight and Westinghouse

■ MHFA's cross–claims against Dwight and Westinghouse rely on the general contract between Dwight and the Owners, and the letter of guarantee by which Westinghouse guaranteed Dwight's obligations arising under the general contract. The letter of guarantee furnished by Westinghouse contains this paragraph:

> Westinghouse guarantees Dwight's obligations of payment for labor performed or furnished and for material used or employed on the Project, hereby waiving notice of any modifications, changes, extensions of time or additions to the Contract; provided, however, that the liability of Westinghouse shall not exceed the sum of $10,454,857 . . .

MHFA, to whom the letter of guarantee was addressed, can enforce its terms only so far as the parties understood the guarantee to extend. As we explained in connection with our discussion of compliance with section 5, it was the understanding of all the parties that this guarantee would extend only to Dwight's immediate obligations— that is, obligations arising out of contracts Dwight executed with subcontractors. Dwight was further obliged to second and third tier suppliers only if they first filed a lien against the project. Plaintiff, New England Concrete Pipe, neither dealt directly with Dwight nor liened against the project. Its claims therefore fall outside the scope of the Westinghouse letter of guarantee, and it was for that very reason that the guarantee was here ruled not to comply with section 5. Accordingly, MHFA

---

**8.** The amount claimed in the complaint, $178,-994.23, minus the backcharge for corrective work, $48,700.

cannot recover on its cross–claim against Westinghouse based, as it is, on the terms of the letter of guarantee.

■ MHFA depends for its cross–claim against Dwight on the general contract between Dwight and the Owners. MHFA is conceded by Dwight to be an intended beneficiary of the general contract, and in that capacity MHFA maintains its cross–claim to compel Dwight to perform its obligations under the contract. Dwight's obligations with respect to suppliers and materialmen are defined in Articles 4 and 11 of the general contract. Article 4.4.1 provides:

> Unless otherwise specifically noted, the Contractor shall provide and pay for all labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation and other facilities and services necessary for the proper execution and completion of the Work.

Article 11 deals with security on the project:

> Contractor shall provide a letter of guarantee in form satisfactory to MHFA, guaranteeing full performance of the work and payment of all subtrades together with such other sureties as shall be acceptable to the MHFA . . . .

Article 4.4.1, standing alone, might be read to place on Dwight the responsibility of seeing to it that all suppliers, of whatever tier, are paid for work or materials delivered to the project. We do not, however, construe this provision so broadly. First, Article 4.4.1 is somewhat ambiguous, appearing as it does in a section of the contract defining in general terms the relation of the contractor to the Owners. It does not, for that reason, convey the sense of a specifically delineated duty to protect unpaid second and third tier contractors, especially in light of a separate provision, Article 11, more directly on point. Second, even if it were so construed, the benefit would not run to MHFA, but rather to the unpaid suppliers and materialmen. MHFA's cross–claim depends on the rules for third party beneficiaries, and an intent to benefit (admitted in Dwight's answer) is essential to that cause of action. To the extent there is

an intent to benefit MHFA, it is expressed in the provisions of Article 11, not Article 4.4.1. Article 4.4.1 might have supported a direct cause of action running to plaintiff against Dwight or the Owner, but Judge Skinner's order denying reconsideration held that there was no intent to benefit suppliers such as the plaintiff. MHFA's cross–claim, on the other hand, derives solely from obligations contained in Article 11.

The purpose of Article 11 of the contract between Dwight and the Owners was to make it Dwight's responsibility to produce a satisfactory letter of guarantee. The benefit MHFA sought from this contract, and the benefit intended by Dwight and the Owners to be conferred on MHFA, was that among the three principals, Dwight, the Owners, and MHFA, a form of security would be fashioned that would bring MHFA into compliance with Section 5 of the MHFA statute. Article 11 was drafted with that in mind. As beneficiary of the contract between Dwight and the Owners, MHFA can enforce the provisions of Article 11 only, not other selected provisions, nor the contract in its entirety. Any other view would be inconsistent. We could not, on the one hand, hold that suppliers such as the plaintiff cannot recover, either on the letter of guarantee, because its protection cuts off at the subcontractor level, or on the contract, because no direct cause of action lies under third party beneficiary rules, and at the same time permit MHFA to enforce obligations in Article 4.4.1 that would extend broadly to all suppliers and make Dwight, in effect, a surety at all levels of the project. Had that been the intent of the parties, Article 4.4.1 would have been sufficient protection without the need for a bond or letter of guarantee.

MHFA's cross–claim therefore turns, in the final analysis, on Article 11. Although Article 11 requires Dwight to furnish a letter guaranteeing payment to all subtrades, which the Westinghouse guarantee did not, the Westinghouse letter was reviewed and accepted by MHFA and therefore it was "in form satisfactory to MHFA." Once MHFA accepted the Westinghouse letter, Dwight's performance un-

der Article 11 was complete–having fully performed, there is no further obligation of Dwight that can be enforced by MHFA as third party beneficiary.

An alternative view of the relationship between Article 11 and Article 4.4.1 reaches the same result. It could be that Article 4.4.1 was designed to work in tandem with whatever guarantee was devised under Article 11. The Westinghouse letter, for example, guarantees "Dwight's obligations", and Article 4.4.1 defines one such obligation. How far the obligations of Article 4.4.1 are meant to extend would thus depend on what the parties intended the scope of the Article 11 guarantee to be. The guarantee accepted by MHFA under Article 11 cut off direct rights of action at the subcontractor level; hence the scope of Article 4.4.1 must be similarly restricted. In effect, Article 4.4.1 is defined by reference to Article 11 and any modifications or waiver varying the terms of Article 11 work also to modify Article 4.4.1, in this instance, confining Dwight's obligation to "pay for all labor, materials", etc. to only the first tier of suppliers. Thus, even if MHFA could enforce Article 4.4.1 as a third party beneficiary, Dwight's obligation under 4.4.1 would not run to second tier suppliers such as the plaintiff. Accordingly, judgment shall enter for Dwight on the cross–claim of MHFA.

In sum, judgment for plaintiff on its claim for damages in Count X is granted in the amount of $130,294.23 with interest at the rate of 8% per annum from August 9, 1974, the date of plaintiff's demand. Defendant MHFA's cross–claims against Dwight, Westinghouse and the Owners are all denied.