JOHN D. AHERN CO., INC. *vs.* TRUSTEES OF BOSTON
UNIVERSITY
(and a companion case[1]).

Suffolk.  May 7, 1981. — June 8, 1981.

Present: GREANEY, CUTTER, & KASS, JJ.

*Contract,* Building contract.  *Bond,* Construction contract bond, Parties.

The owner of a construction project was not rendered liable for unpaid
    sums due certain subcontractors by its failure to advise the subcontrac-
    tors that the payment bond requirement contained in the bid docu-
    ments for the general contract had been waived where the subcontrac-
    tors had had the opportunity to review the bidding documents and the
    general contract and knew or should have known from those docu-
    ments that the owner could alter or waive the bond requirement and
    had waived it; a requirement by an owner, who invites bids from a
    contractor, that the contractor furnish a payment bond for the benefit
    of subcontractors, does not, in the absence of special circumstances,
    create either a contractual undertaking to the subcontractors or a
    representation to them that a payment bond ·will in fact be furnished.
    [49-51]

CONTRACT AND TORT.  Writs in the Superior Court dated
May 9, 1973.

The cases were heard by *Keady,* J., a District Court judge
sitting under statutory authority.

*Peter J. Gagne* for the plaintiffs.

*Robert W. Mahoney* (*Thomas D. Herman* with him) for
Trustees of Boston University.

GREANEY, J.  On July 12, 1971, the Trustees of Boston
University (University) solicited bids for the second phase of
a construction project involving renovations to a multistory
building owned by it at 881 Commonwealth Avenue in Bos-
ton.  Prospective bidders on the general contract were ad-

---

[1] Lord Electric Co., Inc. *vs.* Trustees of Boston University.

vised by the bid instructions that "a . . . payment bond . . . will be required" and by paragraph H of the general bid proposal that their bids should include "the premiums for . . . a [p]ayment [b]ond . . . which shall remain in effect for the duration of the [c]ontract." Article 30 of the general contract conditions provided that "[t]he [o]wner shall have the right, prior to the signing of the [c]ontract, to require the [c]ontractor to furnish [a] bond covering . . . the payment of all obligations arising thereunder, *in such form as the [o]wner may prescribe* and with such sureties as he may approve. *If such bond is required* . . . the premium[s] shall be paid by the [c]ontractor" (emphasis supplied). The last paragraph of Art. 37 of the same conditions stated that "[n]othing in this Article shall create any obligation on the part of the [o]wner to pay or to see to the payment of any sums to any subcontractor." Article 45 of the supplementary general conditions amended Art. 25 of the general contract conditions and provided that final payment to the contractor would release the owner from any liability "for all things done or furnished in connection with this work," except that payments would not relieve "the [c]ontractor or his [s]ureties from any obligations under . . . [the] [p]ayment [b]ond." The successful general bidder made a contract on August 31, 1971, with the University to complete the project. Article 8 of that contract incorporated the general and supplementary conditions and other pertinent requirements contained in the bid documents together with the provisions of "[a]ddendum [t]wo, dated August 30, 1971." Addendum two, among other things, waived the requirement of a payment bond. The plaintiffs agreed with the contractor to be the painting and electrical subcontractors. Each claims to have noted the bond requirement and to have relied on it. Both completed work under their subcontracts about November 1, 1972. Certain sums due them for their work have never been paid,[2] and the contractor has been adjudged a bankrupt.

---

[2] Ahern claims it is owed $10,178.62 out of a total price (with extras) of $14,271.99. Lord claims it is owed $50,538.78 out of a total price (with extras) of $136,578.78.

The plaintiffs sued the University, claiming that its failure to advise them that the payment bond requirement had been waived constituted a negligent misrepresentation which rendered the University liable for unpaid sums due them. After trial, the judge found that the plaintiffs had not been advised that the bond provision had been waived, but that all pertinent information regarding the bond, together with the respective responsibilities of the owner and contractor, had been made available to the subcontractors, and that the University did not specially urge or invite any subbidder to submit bids. He also found that both plaintiffs had advised the University about one month before the project was completed that the contractor owed them money but that neither requested a holdback, and that the plaintiffs could probably have sued on a payment bond if one had been furnished. See G. L. c. 149, § 29A; *Johnson-Foster Co.* v. *D'Amore Constr. Co.*, 314 Mass. 416, 420-422 (1943); *Choate, Hall & Stewart* v. *SCA Servs., Inc.*, 378 Mass. 535, 542-548 (1979); *Powers Regulator Co.* v. *United States Fid. & Guar. Co.*, 7 Mass. App. Ct. 913 (1979). No step was taken by either plaintiff to perfect a lien under G. L. c. 254. The judge ruled that the University's "failure to require . . . a [payment] bond and its failure to notify the plaintiffs of the waiver of the requirement did not constitute a misrepresentation or any other type of act for which [the University] can be held liable." Judgments entered dismissing both actions. On the foregoing facts, the judge's ruling correctly determined the cases.

The controlling principles of law are set forth in *Morse Bros. Elec. Co.* v. *Martin Shore Realty Co.*, 344 Mass. 81 (1962), and in *Superior Glass Co.* v. *First Bristol County Natl. Bank*, 380 Mass. 829 (1980). In *Morse,* general language in the bid instructions that the successful bidder "shall furnish a [g]uarantee [b]ond in the full amount of the contract" for the protection of subcontractors was determined to be controlled by more specific language in the supplementary general conditions which permitted approval of a bond *"in such a form as the* [o]*wner may prescribe . . ."*

(emphasis original). The owner "under such a provision, could limit the scope of the bond to those matters which it might feel that it needed for its own protection." 344 Mass. at 85. Consequently, the owner's acceptance of a bond which did not protect the interests of the subcontractors gave them no direct rights against the owner, nor did the circumstances provide any basis for concluding that the owner would protect them with a bond. In *Superior Glass*, the owner, a bank, allowed the contractor to commence work without furnishing the labor and material bond required by the contract with knowledge that the contractor was unbondable. When the project was completed, the bank, which then knew that the subcontractors were owed substantial sums and that they were unaware of the contractor's poor financial condition and failure to furnish the bond, obtained lien waivers from the subcontractors, disbursed final payment to the contractor, and accepted immediate payment out of those funds for a debt owed to it by the contractor. The Supreme Judicial Court agreed with this court's view (8 Mass. App. Ct. 356, 358-360 [1979]) that the bank's conduct did not subject it to liability "in contract or tort." 378 Mass. at 832. However, the bank's action in lulling unpaid subcontractors into assuming that their creditor positions were protected while giving itself a preference out of the final payment due the contractor created responsibility based on "the peculiarly equitable claims of the subcontractor plaintiffs, enforceable by way of 'constructive trust.'" *Id.* at 834.

These precedents establish that a requirement by an owner, who invites bids from a contractor, that the contractor furnish a payment bond for the benefit of subcontractors, does not, in the absence of special circumstances, create either a contractual undertaking to the subcontractors or a representation to them that a payment bond will in fact be furnished. The plaintiffs in this case had the opportunity to review the bidding documents and the general contract, and they knew, or should have known from Arts. 30 and 37 (the language in the former being identical in per-

tinent part to the language found decisive in the *Morse* case), that the University could alter or waive the bond requirements to meet its needs.[3]  In view of the content of these articles, any reliance by the plaintiffs on statements that a bond would be furnished was not legally justified. The facts found by the judge — which describe an arm's length transaction throughout — did not create or imply a duty on the part of the University to notify subcontractors that it had waived the bond, and nothing comparable to the peculiar equities described in *Superior Glass* has been shown to exist.  Doubtless, it would have been preferable for the University to have reserved its rights to waive the bond requirement in more straightforward language, instead of resorting to the somewhat oblique terminology that was actually used.  But until the millennium of clear expression in construction documents arrives, subcontractors should be on their guard to protect their rights either by checking with the owner for the actual existence of a bond before entering their subcontracts, by requesting holdbacks, or by perfecting statutory liens under G. L. c. 254.

*Judgments affirmed.*

---

[3] The judge found that both plaintiffs asked for and received the volume containing the bidding documents.  In addition, Art. 37 provided that "[t]he [c]ontractor agrees to bind every [s]ubcontractor and every [s]ubcontractor agrees to be bound by the terms of the [a]greement, the [g]eneral [c]onditions of the [c]ontract, the [s]upplementary [g]eneral [c]onditions, the [d]rawings and [s]pecifications as far as applicable to his work . . . unless specifically noted to the contrary in a subcontract approved in writing . . . by the [o]wner or [a]rchitect."  The subcontracts in this case contained no variation of these conditions.