G.M. BUILDERS, INC. *vs*. TOWN OF BARNSTABLE.

Barnstable.   September 11, 1984. — October 22, 1984.

Present: GREANEY, C.J., GRANT, & FINE, JJ.

*Public Works,* Payment bond, General contractor.  *Bond,* Construction contract bond, Parties.

In the circumstances, a town's agreement with the proposed operator of a restaurant at the municipal airport, leasing the restaurant premises, authorizing the lessee to make renovations on the premises and nearby areas, and providing for reimbursement of the cost of renovations by way of rent deductions did not obligate the town to obtain a payment bond under G. L. c. 149, § 29, for the benefit of the contractor who had performed the renovation work under a contract with the restaurant operator. [668-671]

CIVIL ACTION commenced in the Superior Court Department on July 19, 1980.

The case was heard by *Lynch,* J.

*Merriann M. Panarella* for the plaintiff.

*Bruce P. Gilmore,* Town Counsel (*Barbara Harris,* Assistant Town Counsel, with him) for the defendant.

GREANEY, C.J. This is an action by G.M. Builders, Inc. (G.M.), against the town of Barnstable (town) seeking $75,000 in damages for the town's alleged failure to acquire a bond under G. L. c. 149, § 29, as amended through St. 1978, c. 155, § 1, in connection with certain construction work at the Hyannis airport. G.M. claims that it was entitled to protection by such a bond. The action was heard by a Superior Court judge sitting without a jury. The judge entered a memorandum of decision which contained findings of fact and rulings of law. Pursuant to the memorandum, a final judgment entered in the town's favor. G.M. has appealed.

The judge's findings of fact are fully supported by the evidence, see *New England Canteen Serv., Inc.* v. *Ashley,* 372

Mass. 671, 674 (1977), and may be summarized as follows. On October 17, 1978, the town, through its airport commission, was informed that a corporation known as LaCipollina at the Airport, Inc. (LaCipollina), intended to assume management of the restaurant at the airport and that, in connection with the takeover, LaCipollina planned renovations of the restaurant premises and nearby areas. LaCipollina's architect prepared plans for the renovations, which were submitted for approval to the commission. In November, 1978, representatives of LaCipollina attended a meeting of the commission at which the plans and their cost were discussed. The commission approved the intended renovations as well as "the concept of [a] proposed lease" between the town and LaCipollina. On November 27, 1978, the commission sent a "letter of intent" to LaCipollina which outlined the provisions of the proposed lease and included details for payment of the rent. The letter required that "[e]vidence of bonding, disclaimers and hold harmless documents must be presented to the [c]ommission prior to the start of actual construction."

In meetings in December, 1978, and January, 1979, the commission again discussed the proposed lease with LaCipollina's representatives. These discussions included provisions for reimbursement of LaCipollina for the cost of its renovations. On February 8, 1979, the town through the commission, as lessor, and LaCipollina, as lessee, executed a lease for an initial term of ten years with an option to extend for an additional ten years. Among other provisions, the lease required LaCipollina to pay a fixed annual base rent to the town, together with a percentage of its gross receipts from the operation of the restaurant and cocktail lounge. Article Thirty of the lease recognized that LaCipollina contemplated making renovations to the building containing the demised premises, including additions which would expand the lobby and other nonrestaurant areas and improve the restaurant's premises and facilities. LaCipollina was given the right to recapture during the initial term of the lease, primarily by way of deductions from percentage rent, the entire cost of each such type of construction, according to specified detailed formulae. The

only reference to a bond appeared in Article Twenty-One of the lease.[1] At the conclusion of the lease were appended various papers collectively referred to as "contract documents".[2]

During the same period that LaCipollina was negotiating the terms of the lease with the commission, it was also negotiating with G.M. for the project's construction. On February 13, 1979, LaCipollina accepted a final proposal from G.M. setting a total construction price of $265,000 for G.M.'s work. G.M.'s proposal stated that its "figure also includes a performance and payment bond as requested".[3] G.M. was aware of the provisions of the lease and also knew that there had been no public bidding for the job.

G.M. commenced its work under the contract with LaCipollina without determining that a bond had been provided for its protection. G.M. made no inquiry to ascertain whether LaCipollina had provided the bond specified in Article Twenty-One of the lease, see note 1, *supra*. G.M. also failed to consult an attorney to advise it concerning bonds or security. On March 1, 1979, it sent an invoice to LaCipollina "for work completed to date." Item no. 1 on that invoice requested payment of the premium fee for a bond procured by G.M. pursuant to its agreement with LaCipollina.[4]

---

[1] That provision read in relevant part as follows: "Prior to undertaking any construction hereunder, [LaCipollina] agrees to provide a Performance and Materials bond issued by a company authorized to issue bonds in the Commonwealth of Massachusetts, running to the [commission] in an amount sufficient to cover the entire cost for construction . . . determined by the Town of Barnstable Airport Commission."

[2] These documents refer to the plans and specifications and included a copy of the "Agreement between Owner and Contractor." This agreement was blank except for the handwritten insertion of the name of LaCipollina's architect as the project engineer.

[3] The judge also found that representatives of the town had never had any "discussion . . . which reasonably [could] have led G.M. to believe that any bond other than the one required in Article Twenty-One of the [l]ease would be forthcoming."

[4] On each periodic invoice sent thereafter to LaCipollina, G.M. continued to bill for the bond. On its final invoice dated July 11, 1979, G.M. still listed the "[b]ond" under Item 1 as 100% complete, with $3,233 due to G.M. This bond, from what little appears about it in the record, was

LaCipollina encountered financial difficulties, eventually defaulted, and was adjudicated a bankrupt. Before that juncture, however, G.M. and LaCipollina, on May 22, 1979, entered into an additional agreement by which G.M. agreed to accept payment of the sums then owed it by LaCipollina over a three-year period, in equal monthly payments, on a direct reduction basis, and LaCipollina agreed to execute a promissory note therefor with interest. In this agreement, signed for G.M. by its president and treasurer, it was acknowledged that "G.M. has acted as *general contractor* with respect to [the project] *on behalf of [La]Cipollina*" (emphasis supplied).

The judge noted that G.M. sought recovery on a theory that the town had violated a duty, imposed on it by the lease and the contract documents, to obtain a bond under G. L. c. 149, § 29, to pay G.M. for its work under the construction agreement. The judge viewed the case as requiring a "close analysis of the relationship of the various parties," concluding, on the facts found, that "when it came to the work to be done on the [b]uilding, the [o]wner for purposes of the general contract was LaCipollina and not the [t]own," and that G.M. was LaCipollina's "general contractor." On the facts found, the judge ruled that the town had not made any contract which would oblige it to obtain a bond under G. L. c. 149, § 29, and that G.M. had no rights under the bond which LaCipollina had agreed to furnish the town in accordance with Article Twenty-One of the lease.

The first paragraph of G. L. c. 149, § 29, provides, in relevant part, that "[o]fficers or agents contracting in behalf of any . . . town . . . for the construction, reconstruction, alteration, remodeling, repair or demolition of public buildings . . . when the amount of the contract . . . is more than two thousand dollars, shall obtain security by bond in an amount not less than one half of the total contract price, for payment by the contractor and subcontractor for labor performed or fur-

---

intended to secure for G.M. coverages for worker's compensation and comprehensive general liability.

nished and materials used." The statute "afford[s] security to subcontractors and materialmen in public works because they do not have the benefit of a mechanic's or materialman's lien, as would be the case in private construction work." *Floors, Inc.* v. *B.G. Danis, Inc.*, 7 Mass. App. Ct. 356, 358 (1979), *S.C.*, 380 Mass. 91 (1981). See *American Air Filter Co.* v. *Innamorati Bros.*, 358 Mass. 146, 150 (1970); *Peters* v. *Hartford Acc. & Indem. Co.*, 377 Mass. 863, 865, 866 (1979). As such, the statute does not afford protection to general contractors who deal directly with public officials. See *Friedman* v. *County of Hampden*, 204 Mass. 494 (1910); *Duteau* v. *Salvucci*, 330 Mass. 531, 535 (1953). Nor, quite obviously, does the statute cover general contractors who deal with private entities.

There is no dispute that the restaurant and adjacent areas at the airport are portions of public buildings owned by the town or that the project involved "reconstruction" or "remodeling" of such buildings. G.M. has never questioned the validity of its agreement with LaCipollina and the latter's lease with the town, nor has G.M. contended that the over-all arrangement might violate the laws governing the public bidding of public works projects. See G. L. c. 149, §§ 44A-44L, as in effect prior to St. 1980, c. 579, § 55. The question before us is therefore a narrow one. We must decide whether (as G.M. contends) the lease between the town and LaCipollina obliged the town to obtain a bond under G. L. c. 149, § 29, for G.M.'s benefit or whether (as the town contends) G.M. entered a contract solely with LaCipollina, a private corporation, making itself a general contractor which would not be protected by G. L. c. 149, § 29.

We conclude that the latter was the case. The lease agreement between the town and LaCipollina was not a contract for construction or renovation of a public building within the meaning of G. L. c. 149, § 29. The lease between the town and LaCipollina acknowledged the latter's right to make certain renovations to premises within a public building but did not *require* that LaCipollina undertake or complete any renova-

tions.[5] The renovations remained, at all times, the sole responsibility of LaCipollina and not the responsibility of the town. LaCipollina thus became bound to the lease irrespective of its completion of the renovations.

Nor did the town make any financial commitment to G.M. in any capacity. G.M. is not a party to the lease and is nowhere mentioned in its terms. The town's sole financial obligation inured to the benefit of LaCipollina and permitted LaCipollina to recapture the cost of any renovations completed by means of credits, taken over the base term of the lease, against the rent due the town. The requirement of a bond in Article Twenty-One of the lease was imposed on LaCipollina for the *town's* benefit.[6]

The town's general right, reserved in the lease, to approve plans and specifications would not create a duty to G.M. to see that a bond was obtained. This approval power simply gave the town, acting through its airport commission, the right to ensure that LaCipollina completed any renovations undertaken by it in a manner consistent with the public interest in the proper maintenance of the airport's facilities. Reimburse-

---

[5] G.M.'s argument that Article Seven of the lease obliged LaCipollina to make the renovations is not persuasive. That article merely provides that LaCipollina needed the commission's approval for any renovations beyond those already approved. Article Thirty of the lease is the governing provision on the point, and that provision imposed no obligation on LaCipollina to make the renovations. Other provisions of the lease, particularly Article Two ("Term"), Article Three ("Rent") and Article Five ("Net Lease") confirm the interpretation of Article Thirty just stated.

[6] The judge ruled that the obligee of this bond was the town, which had required the bond to protect itself in the event that LaCipollina "might embark on extensive renovation and reconstruction of the premises, proceed to a stage where demolition of substantial portions of the premises had been carried out, and then . . . default [leaving the town] unable to put the building back together in a good and workmanlike manner." We think the judge's analysis of the function of this bond is correct and that G.M. knew or should have known that this bond would not provide it with any security. We also agree with the judge's ruling that the "[t]own's failure to require that LaCipollina furnish the . . . bond required by Article Twenty-One was not a legal cause of any loss or damage to G.M., which has no standing to urge a breach of that provision." See *John D. Ahern Co.* v. *Trustees of Boston University,* 12 Mass. App. Ct. 47, 50-51 (1981).

ment of the cost of renovations by way of rent deduction did, of course, give the town a financial interest in the project. This interest, however, is not sufficient in our view to alter the nature of the relationship between the parties or to make G.M. a subcontractor. We perceive no basis, in either the facts found by the judge or in the lease, to conclude that LaCipollina was the town's agent for any purpose which would impose on the town a duty to provide a bond under G. L. c. 149, § 29, for G.M.'s benefit.

We note further that G.M., at all material times, viewed itself as the general contractor for LaCipollina rather than for the town. G.M. agreed with LaCipollina to furnish all labor and materials necessary to complete the work and to procure a performance and payment bond, consistently billed LaCipollina as the owner as the contract progressed for work completed, and styled itself as the general contractor for the project in the May 22, 1979, agreement with LaCipollina for deferred payment of the balance owed on the contract. It is also significant that G.M. made provision for the subtrades on the project and billed LaCipollina for the work performed by the subcontractors. These facts undermine G.M.'s argument that everything it did was part of one large subcontract made with LaCipollina, the latter acting as a general contractor on behalf of the town. That argument appears plainly to be an afterthought which occurred to G.M. when it became obvious that LaCipollina would not satisfy its obligations under the May 22, 1979, agreement.[7] We conclude that the town entered a lease with LaCipollina which authorized the latter's project but which left it to LaCipollina to pick its own contractor. LaCipollina in turn made its construction contract with G.M., independent

---

[7] G.M.'s reliance on the "contract documents" attached to the lease, see note 2, *supra,* to create a relationship within the purview of G. L. c. 149, § 29, is misplaced. The documents do not identify any of the parties as the owner or as the general contractor. As noted, the so called "Agreement" between Owner and Contractor" is blank except for the name of the project engineer, who was an employee of LaCipollina. We think these documents did not constitute an agreement which would refute the basic premise that G.M. was entering a contract with LaCipollina, not one with the town.

of any contractual commitment it had with the town. By the terms of the agreement between G.M. and LaCipollina, G.M. became the general contractor for LaCipollina's project.[8] In the circumstances, the town was not required to see that a bond was posted under G. L. c. 149, § 29, for G.M.'s benefit,[9] and G.M. is referred to its remedies against LaCipollina, including the possibility of placing a lien on the latter's interest in the leasehold.

*Judgment affirmed.*

---

[8] The fact that G.M. was a general contractor renders the cases relied upon by G.M. inapposite since they all involve actions by subcontractors or materialmen to recover on a bond required of the general contractor under G. L. c. 149, § 29. The case relied upon by G.M. at oral argument as the "strongest case" for its position, *New England Concrete Pipe Corp.* v. *D.C. Systems Inc.,* 495 F. Supp. 1334 (D. Mass. 1980), vacated (on procedural grounds), 658 F.2d 869 (1st Cir. 1981), does not contain anything repugnant to the conclusions herein.

[9] We emphasize again, however, that we do not express an opinion whether a public entity can lawfully contract for a public work by means of lease or other agreements which have the effect of avoiding compliance with the public bidding laws, G. L. c. 149, §§ 44A-44I. This case was tried in the Superior Court on the basis that the various agreements between the parties were valid. Our inquiry is strictly limited to a construction of the agreements which were in fact made by the parties and their legal ramifications under G. L. c. 149, § 29.